## UNITED STATES *v.* MILLE LAC BAND OF CHIPPEWA INDIANS IN THE STATE OF MINNESOTA.

### APPEAL FROM THE COURT OF CLAIMS.

No. 736. Argued April 8, 9, 1913.—Decided June 9, 1913.

When Congress passed the act of January 14, 1889, adjusting relations with the Mille Lac Chippewas a real controversy was subsisting which was thereby adjusted and composed, and the act is to be construed according to its plain and unambiguous terms.

Indians, no less than the United States, are bound by the plain import of the language of an act of Congress and an agreement conferring substantial benefits on them.

Under the act of January 14, 1889, the Mille Lac Chippewas received substantial benefits in consideration whereof they released their claims to lands in the Red Lake Reservation upon which there were valid preëmption and homestead entries, and the United States is not bound to account to them for the proceeds of sale of such lands; but, as to the other lands, the United States held them in trust for the Mille Lac Chippewas who are entitled to damages under the act on the basis of the value of such lands in 1889.

In interpreting a proviso in a statute, it will not be given a meaning that would amount to entirely rejecting it.

In a contract with Indians, such as that embodied in the act of January 14, 1889, a reference to regular and valid preëmption and homestead entries of land within a reservation would include all that were not fraudulent and would not exclude all entries on the ground of invalidity because made on lands within an Indian reservation.

47 Ct. Cl. 415, reversed.

THE facts, which involve the construction and interpretation of the various treaties, agreements and statutes relating to the Mille Lac Reservation, are stated in the opinion.

*Mr. Assistant Attorney General Adkins* and *Mr. George M. Anderson* for the United States.

*Mr. George B. Edgerton* and *Mr. F. W. Houghton,* with whom *Mr. C. E. Richardson, Mr. Harvey .S. Clapp* and *Mr. Daniel B. Henderson* were on the brief, for appellees.

MR. JUSTICE VAN DEVANTER delivered the opinion of the court.

This suit was begun under the act of February 15, 1909, 35 Stat. 619, c. 126, which authorized the Court of Claims "to hear and determine a suit or suits to be brought by and on behalf·of the Mille Lac Band of Chippewa Indians in the State of Minnesota against the United States on account of losses sustained ·by them or the Chippewas of Minnesota by reason of the opening of the Mille Lac Reservation . . . to public settlement under the general land laws of the United States."

The lands to which the act and the suit relate are four fractional townships bordering on the Mille Lac in Minnesota, and three islands in that lake, comprising in all a little more than 61,000 acres. The suit was begun in the name of the Mille Lac Band, and the Court of Claims, two judges dissenting, gave judgment against the United States in the sum of $827,580.72, with a direction, in substance, that the amount recovered be credited· to the Chippewas of Minnesota and distributed among them under the provisions of § 7 of the act of January 14, 1889, 25 Stat. 642, c. 24. 47 Ct. Cl. 415. 'The case is here upon the appeal of the United States.

The judgment was sought and was rendered on the theory that the lands ·were set apart and reserved for the occupancy and use of the Mille Lac Band by treaties of February 22, 1855, 10 Stat. 1165; March 11, 1863, 12 Stat: 1249, and May 7, 1864, 13 Stat. 693, and were subsequently relinquished to the United States pursuant to the act of January 14, 1889, *supra,* upon certain trusts therein named, and that in violation of those treaties and

that act they were opened to settlement and disposal under the general land laws of the United States and were disposed of thereunder, to the great loss and damage of the Mille Lac Band of the Chippewas of Minnesota.

The arguments at the bar and in the briefs are addressed to these questions: 1. The scope of the jurisdictional act. 2. The rights of the Indians in the lands under the treaties of 1863 and 1864. 3. The effect to be given to the act of 1889 and its acceptance by the Indians. 4. Whether the disposal of the lands, or any of them, under the general land laws was violative of the rights of the Indians.

The jurisdictional act makes no admission of liability, or of any ground of liability, on the part of the Government, but merely provides a forum for the adjudication of the claim according to applicable legal principles. Nor does it contemplate that recovery may be founded upon any merely moral obligation, not expressed in pertinent treaties or statutes, or upon any interpretation of either that fails to give effect to their plain import, because of any supposed injustice to the Indians. *United States* v. *Old Settlers,* 148 U. S. 427, 469; *United States* v. *Choctaw &c. Nations,* 179 U. S. 494, 735; *Sac and Fox Indians,* 220 U. S. 481, 489.

Under the treaty of 1855, *supra,* there were reserved for the occupancy and use of the Mississippi bands of Chippewas, of which the Mille Lac Band was one, six separate tracts of land in Minnesota. One of these embraced the townships and islands before mentioned, and came to be separately occupied by the Mille Lacs, although all the reservations were claimed in common by all the bands. By the treaty of 1863, *supra,* the lands in the six reservations, the one occupied by the Mille Lacs being in terms included, were expressly ceded to the United States (Art. I), and one large tract of other lands in Minnesota was reserved for the future home of all the bands, including

the Mille Lacs (Art. II).  Provision was made (Art. IV) ·
for clearing and breaking a limited area in the new reserva-
tion for each of the bands, the Mille Lacs being in terms
included, and (Art. VI) for removing the agency and saw
mill from one of the ceded reservations to the new.  Ar-
ticle XII of this treaty was as follows,—special importance
being now attached to its proviso (p. 1251):

"It shall not be obligatory upon the Indians, parties to
this treaty, to remove from their present reservations,
until the United States shall have first complied with the
stipulations of Articles IV. and VI. of this treaty, when
the United States shall furnish them with all necessary
transportation and subsistence to their new homes, and
subsistence for six months thereafter: *Provided,* That,
owing to the heretofore good conduct of the Mille Lac
Indians, they shall not be compelled to remove so long as
they shall not in any way interfere with or in any manner
molest the persons or property of the whites."

The treaty of 1864, *supra,* superseded that of 1863, and
in so far as their provisions are material here they were
identical, so we shall speak only of the later one.  In addi-
tion to the creation of the single large reservation, provi-
sion was made for the payment of large annuities to the
Indians in consideration for the cession of the six original
reservations, and it is not questioned that these annuities
were duly paid to all the bands, including the Mille Lacs,
nor that there was a full compliance with Articles IV and
VI.

A treaty negotiated in 1867, 16 Stat. 719, eliminated a
considerable portion of the large tract reserved by Ar-
· ticle II of the treaty of 1864 and substituted a new tract,
consisting of thirty-six townships, which came to be known
as the White Earth Reservation.  This treaty is not im-
portant here, save as it explains subsequent references to
the White Earth Reservation.

A controversy soon arose over the meaning and effect

of the proviso to Article XII of the treaty of 1864 declaring, "that, owing to the heretofore good conduct of the Mille Lac Indians, they shall not be compelled to remove [from the old reservation to the new one] so long as they shall not in any way interfere with or in any manner molest the persons or property of the whites." On the part of the executive and administrative officers it was insisted—not, however, without some differences among themselves—that the proviso did not invest the Mille Lacs with any right in the old reservation expressly ceded by Article I of the treaty, but merely permitted them to remain thereon as a matter of favor; that one purpose of the cession was to enable the Government to survey the lands and open them to settlement, and that it was not intended that the permission to remain should interfere with this. But the Mille Lacs maintained that the proviso operated to reserve the lands for their occupancy and use indefinitely, and that the lands could not be opened to settlement while they remained and conducted themselves properly towards the whites in that vicinity. The survey was made, the lands were declared open to settlement and entry, and entries in considerable numbers were allowed from time to time; but the Mille Lacs persisted in their claim and refused to move, although repeatedly entreated to do so. This continued to be the situation until the act of 1889 was passed by Congress and accepted by the Mille Lacs and other Chippewas of Minnesota. In the meantime an order was issued by one Secretary of the Interior suspending the allowance of further entries, as also further action upon those already allowed, and this order was recalled by a succeeding Secretary. Congress then passed the act of July 4, 1884, 23 Stat. 76, 89, c. 180, directing that the lands should not "be patented or disposed of in any manner until further legislation." The entries allowed up to that time covered about 55,000 acres, or approximately nine-tenths of the lands, and some were under

investigatión upon charges that they were fraudulent. After the passage of the act of 1884, all further action was suspended awaiting further legislation.

That legislation came in the act of 1889. It provided for a commission to negotiate with all the bands of Chippewas in Minnesota for the cession and relinquishment of all their reservations, excepting the White Earth and Red Lake Reservations, and for the cession and relinquishment of so much of them as should not be required for allotments. It further provided that the cession and relinquishment should be obtained as to each reservation, other than the Red Lake, through the assent in writing of two-thirds of the male adults of the band "occupying and belonging to" it, and, as to the Red Lake Reservation, through a like assent of two-thirds of the male adults of all the Chippewas in the State; that the cession and relinquishment as to each reservation should be subject to the approval of the President, and when approved should operate as a complete extinguishment of the Indian title "for the purposes and upon the terms" stated in the act; that thereupon all the Chippewas in the State, excepting those on the Red Lake Reservation, should be removed to and take up their residence on the White Earth Reservation and receive allotments in severalty therein, and allotments to those on the Red Lake Reservation should be made in that reservation; that any Indian residing on any of said reservations might, in his discretion, take his allotment "on the reservation where he lives . . . instead of being removed;" that the ceded lands not so allotted should be classified as "pine lands" and as "agricultural lands" and be disposed of in the manner and at the prices stated in the act; and (§ 7) that all moneys accruing from their disposal, after deducting expenses, should be placed in the treasury of the United States to the credit of all the Chippewas of Minnesota as a trust fund, drawing interest at five per cent. per annum, the interest to be used

for their benefit and the principal to be distributed among them at the end of fifty years. In § 6 there was a proviso, deemed important here, declaring "That nothing in this act shall be held to authorize the sale or other disposal under its provision of any tract upon which there is a subsisting, valid, preëmption or homestead entry, but any such entry shall be proceeded with under the regulations and decisions in force at the time of its allowance, and if found regular and valid, patents shall issue thereon."

Through negotiations conducted under the authority of that act, the commissioners secured agreements with the Indians embodying the contemplated cessions and relinquishments, and these, upon submission to the President, were approved by him March 4, 1890. The agreement with the Mille Lacs, in addition to embodying a cession and relinquishment of the lands in the White Earth and Red Lake Reservations not required for allotments, contained an express assent to all the provisions of the act of 1889 and an express relinquishment of the lands in the Mille Lac Reservation, as is shown by the following excerpt from the agreement:

"We, the undersigned, being male adult Indians over eighteen years of age of the Mille Lac Band of Chippewas of the Mississippi, occupying and belonging to the Mille Lac Reservation under and by virtue of a clause in the twelfth article of the treaty of May 7, 1864 (13 Stat., p. 693), do hereby certify and declare that we have heard, read, interpreted and thoroughly explained to our understanding the act of Congress, approved January 14, 1889, entitled 'An act for the relief and civilization of the Chippewa Indians in the State of Minnesota' (Public, No. 13), which said act is embodied in the foregoing instrument, and after such explanation and understanding, have consented and agreed to said act, and have accepted and ratified the same, and do hereby accept and consent to and ratify the said act, and each and all of the provisions

thereof, . . . and we do also hereby forever relinquish to the United States the right of occupancy on the Mille Lac Reservation, reserved to us by the twelfth article of the treaty of May 7, 1864."

This agreement was negotiated at a council of the Mille Lacs, wherein they reiterated their claim under Article XII and at first declined to assent to the act of 1889, but upon further consideration assented and then signed the agreement. The commission, in reporting the result of its labors, gave a tabulated statement of the reservations, with the area of each, covered by the relinquishments, and included the Mille Lac Reservation, with an area of 61,014 acres, in the statement. In submitting the agreements, including that with the Mille Lacs, to the President, with the recommendation that each be separately approved, as was done, the Secretary of the Interior referred to the prolonged controversy with the Mille Lacs and said: "The rights of the Indians upon this reservation have been a vexed question, full of difficulties and embarrassments, but it is hoped that this agreement will furnish a basis for its early and final solution." Upon approving the agreements (they were sometimes spoken of as constituting in the aggregate a single document) the President transmitted a copy of them and of the accompanying papers to Congress for its information, and in the letter of transmittal said: "Being satisfied from an examination of the papers submitted that the cession and relinquishment by said Chippewa Indians of their title and interest in the lands specified and described in the agreement with the different bands or tribes of Chippewa Indians in the State of Minnesota was obtained in the manner prescribed in the first section of said act, and that more than the requisite number have signed said agreement, I have, as provided by said act, approved the said instruments in writing constituting the agreement entered into by the commissioners with said Indians." Shortly

thereafter, and before the Mille Lacs removed from the old reservation, Congress passed the act of July 22, 1890, 26 Stat. 290, c. 714, whereby a railroad right of way, including station grounds, was granted through that reservation upon condition that compensation therefor be paid to the United States for the use of the Indians and that a failure to use the right of way and station grounds for railroad purposes should inure to the benefit of the Indians, thereby recognizing that the Indians had then come to have an interest in the disposal of the lands.

After the Mille Lacs gave their assent to the act of 1889 the entries theretofore allowed were examined and passed upon by the Land Department in regular course and such as were found to be regular and *bona fide* were passed to patent. The remaining lands in the reservation were subsequently disposed of, not under the act of 1889, but under the general land laws, in pursuance of directions contained in the joint resolutions of December 19, 1893, 28 Stat. 576, and May 27, 1898, 30 Stat. 745.

Whatever might be said of its merits, it is apparent that there was a real controversy between the Mille Lacs and the Government in respect of the rights of the former under Article XII of the treaty of 1864, and that the controversy was still subsisting when the act of 1889 was passed by Congress and assented to by the Indians. And we think it also is apparent that this controversy was intended to be and was thereby adjusted and composed. A manifest purpose of the act was to bring about the removal to the White Earth Reservation of all the scattered bands, residing elsewhere than on the Red Lake Reservation, the Mille Lacs as well as the others; and this was to be accomplished, not through the exertion of the plenary power of Congress, but through negotiations with and the assent of the Indians. The provision in § 6 for perfecting subsisting preëmption and homestead entries, if found regular and valid, pointed most persuasively to a

purpose to extend the negotiations to the Mille Lac Reservation. The commission, the Secretary of the Interior, and the President, in seeking, obtaining and approving the relinquishment of that reservation, all treated it as within the purview of the act, and the Mille Lacs did the same. Then, too, Congress recognized by the act of 1890, shortly following the approval of the agreement, that the Indians had come to have an interest in the disposal of the lands in that reservation.

But while the Government thus waived its earlier position respecting the status of the reservation and consented to recognize the contention of the Indians, this was done upon the express condition, stated in the proviso to § 6, "That nothing in this act shall be held to authorize the sale or other disposal under its provisions of any tract upon which there is a subsisting, valid preëmption or homestead entry, but any such entry shall be proceeded with under the regulations and decisions in force at the time of its allowance, and if found regular and valid, patent shall issue thereon." In other words, the controversy was intended to be and was adjusted and composed by concessions on both sides, whereby the lands in the Mille Lac Reservation were put in the same category, and were to be disposed of for the benefit of the Indians in the same manner, as the lands in the other reservations relinquished under the act, but subject to the condition and qualification that all subsisting *bona fide* preëmption and homestead entries should be carried to completion and patent under the regulations and decisions in force at the time of their allowance.

True, it is said on behalf of the Indians that they did not so understand the act, that is, did not understand that existing entries could be thus carried to patent. But of this it is enough to observe that the language of the proviso to § 6 is plain and unambiguous; that the agreement recites that the Mille Lacs "do hereby accept and consent to and

ratify the said act, and each and all of the provisions thereof;" and that the Indians, no less that the United States, are bound by the plain import of the language of the act and the agreement. Not only so, but the act conferred upon the Mille Lacs many very substantial advantages which doubtless constituted the inducement to the adjustment and composition to which they assented. Among other advantages; it enabled them to share in the proceeds of the disposal of a vast acreage of lands in which they otherwise would have had no interest.

On behalf of the Indians it also is said that the proviso was limited to "regular and valid" preëmption and homestead entries, and that no entry of lands within an Indian reservation could come within that limitation. But this assumes the existence of the Mille Lac Reservation at the time of the entries, which was the very matter in dispute. Besides, the interpretation suggested could not be accepted without wholly rejecting the proviso, for if it was inapplicable to entries in the Mille Lac tract, it was equally inapplicable to any in the other tracts relinquished under the act. In saying this we do not indicate that there were other entries, for the reports of the Land and Indian Offices, which were before Congress when the act of 1889 was passed, disclosed the entries in the Mille Lac tract and did not show any others. Of course, the proviso cannot be rejected. It had an office to perform and must be given effect. It meant, as its terms plainly show, that entries made in accordance with existing regulations and decisions could, if *bona fide*, be carried to completion and patent in the usual way; and the phrase "if found regular and valid" was evidently used with special reference to the charge that some of the entries were fraudulent and with the purpose of eliminating such as were of that character.

We are accordingly of opinion that the act of 1889, to which the Indians fully assented, contemplated and

authorized the completion, and the issuing of patents on, all existing preëmption and homestead entries in the Mille Lac tract which in the course of proceedings in the Land Department should be found to be within the terms of the proviso to § 6, and therefore that no rights of the Indians were infringed in so disposing of lands embraced in such entries. And we think the evident purpose of the proviso requires that it be held to include entries of that class theretofore passed to patent, of which there were some instances during the early period of the controversy.

As respects other lands in that tract, that is, such as were not within the terms of the proviso, we are of opinion that they came within the general provisions of the act and were to be disposed of thereunder for the benefit of the Indians, in like manner as were the ceded lands in the other reservations, of which it was said in *Minnesota* v. *Hitchcock*, 185 U. S. 373, 394: "The cession was not to the United States absolutely, but in trust. It was a cession of all of the unallotted lands. The trust was to be executed by the sale of the ceded lands and a deposit of the proceeds in the Treasury of the United States to the credit of the Indians, such sum to draw interest at five per cent."

As before stated, the lands not within the proviso were disposed of, not under the act of 1889, but under the general land laws; not for the benefit of the Indians, but in disregard of their rights. This was clearly in violation of the trust before described, and the Indians are entitled to recover for the resulting loss. In principle it is as if the lands had been disposed of conformably to the act of 1889 and the net proceeds placed in the trust fund created by § 7, and the Government then had used the money, not for the benefit of the Indians, but for some wholly different purpose. That the wrongful disposal was in obedience to directions given in two resolutions of Congress does not make it any the less a violation of the trust. The resolu-

tions, unlike the legislation sustained in *Cherokee Nation* v. *Hitchcock*, 187 U. S. 294, 307, and *Lone Wolf* v. *Hitchcock, Id.* 553, 564, 568, were not adopted in the exercise of the administrative power of Congress over the property and affairs of dependent Indian wards, but were intended to assert, and did assert, an unqualified power of disposal over the lands as the absolute property of the Government. Doubtless this was because there was a misapprehension of the true relation of the Government to the lands, but that does not alter the result.

The Court of Claims gave no effect to the proviso to § 6, and the findings afford no basis for separating the damages rightly recoverable from those erroneously assessed on account of lands disposed of under preëmption and homestead entries allowed prior to the act of 1889. The case must therefore be remanded for a reassessment of the damages.

By reason of a contention advanced in the briefs, it is well to observe that the damages should be assessed on the basis of the prices which would have been controlling had the act of 1889 been rightly applied.

The judgment is reversed, and the case is remanded for further proceedings in conformity with this opinion.

*Reversed.*

MR. JUSTICE MCKENNA and MR. JUSTICE DAY dissent.