## GREAT NORTHERN RAILWAY COMPANY *v.* REED ET AL.

### CERTIORARI TO THE SUPREME COURT OF THE STATE OF WASHINGTON.

No. 57.   Submitted October 15, 1925.—Decided April 12, 1926.

1. The term "settlement" is used in the Homestead Law as comprehending acts done on the land by way of establishing, or preparing to establish, an actual personal residence—going thereon and, with reasonable diligence, arranging to occupy it as a home, to the exclusion of one elsewhere. P. 545.

2. One who actually settles on public lands in an honest effort to acquire a home, under the Homestead Law, should be dealt with leniently, and not subjected to the loss of his toil and efforts through any mistake or neglect of the officers or agents of the Government. P. 546.

3. But this rule does not excuse substantial failures to comply with the requirements respecting the initiation of such a claim or record

to it a preference over other claims lawfully acquired and prior in time. P. 546.

4. A selection of unsurveyed land, duly made by a railroad company pursuant to an Act of Congress (Aug. 8, 1892, 27 Stat. 390,) giving it a legal right to select such lands, " to which no adverse right or claim shall have attached or have been initiated at the time of making such selection," in lieu of others relinquished to the United States, takes precedence over a later homestead claim. P. 547.

5. Before the filing of a railroad selection, under the Act of Aug. 8, 1892, *supra*, for part of the tract, a person with the qualifications prescribed by the homestead law, visited, for a few hours, an unsurveyed quarter section of unappropriated public land, blazed a trail around it and posted notices that he claimed it as a homestead; and visited it again, five months later, and devoted a day to blazing a trail from an adjacent stream to the nearest corner, and to cutting some poles and laying them in the semblance of a cabin foundation. After the filing of the selection, he visited the land once or twice a year, for several years thereafter, while on hunting trips, and renewed his notices; and thereafter sold his claim. From the time he first went on the land, and continuously to the time he sold, he was residing with his wife and children at a place a few miles distant maintaining a home there. His intention throughout was to " hold " the quarter section, expecting some day to go and live upon it. *Held* that he did not make a *bona fide* settlement, and that his acts did not amount to the initiation of a claim, within the meaning of the Homestead Law or the Act of Aug. 8, 1892, *supra*.

126 Wash. 312, reversed.

CERTIORARI to a judgment of the Supreme Court of Washington which affirmed a judgment for the plaintiff, Reed, in a suit to have the Railway Company declared trustee for him of land patented to it by the United States, and to compel a conveyance in discharge of the trust.

*Messrs. F. G. Dorety, Thomas Balmer,* and *Edwin C. Matthias* were on the brief, for petitioner.

*Messrs. E. V. Kuykendall, E. S. McCord,* and *Walter B. Whitcomb* were on the brief, for respondents.

MR. JUSTICE VAN DEVANTER delivered the opinion of the Court.

This was a suit in a state court in Whatcom County, Washington, against the Great Northern Railway Company to have it declared a trustee for the plaintiff of the title to a quarter-quarter section of land, theretofore patented to it by the United States, and to compel a conveyance in discharge of the trust. The company in its answer denied much that was alleged in the complaint and sought a decree quieting the title. On the trial the plaintiff prevailed, and the Supreme Court of the State affirmed the decree. 126 Wash. 312.

The suit involved a conflict between a railroad lieu selection and an asserted homestead settlement. The evidence on the material issues was so direct and free from contradiction that the real controversy was over the application of federal statutes to facts conceded or definitely established.

The Great Northern Railway Company is the successor in interest of the St. Paul, Minneapolis and Manitoba Railway Company, which constructed and put in operation certain lines of railroad in the State of Minnesota and the Territory of Dakota and thereby became entitled under an early land grant by Congress to particular lands along those lines. The land officers of the United States denied the company's right to the lands along the lines in Dakota, and treated those lands as open to settlement, entry and disposal under the public land laws. In 1890 this Court pronounced the action of the land officers erroneous and sustained the right of the railway company to the Dakota lands. *St. Paul, Minneapolis and Manitoba Ry. Co.* v. *Phelps,* 137 U. S. 528. In the meantime many of the lands had come to be occupied and improved by persons who had made entries or purchases of them as public lands under the ruling of the

land officers.  To correct the resulting wrong to both the
company and the individual claimants, Congress by the
Act of August 8, 1892, c. 382, 27 Stat. 390, requested
the company to relinquish its right to such lands, to the
end that the United States might invest the individual
claimants with a good title, and declared that the com-
pany on executing the relinquishment should be entitled
to select and receive other lands in equal quantity.  The
company complied with that request and thus became
entitled as matter of legal right, and not of grace, to
select and receive other lands conformably to the terms
of the Act.  Shortly described, the Act provided that the
selections might be made within any of the States " into
or through which the railway owned by the said railway
company runs "—Washington being one—from the non-
mineral, unreserved public lands therein " to which no
adverse right or claim shall have attached or have been
initiated at the time of the making of such selection ";
that not exceeding 640 acres should be selected in a single
body; that the mode of selection should be by filing
descriptive lists in the land offices for the districts where
the selected tracts lay and paying the usual fees of the
local land officers; that selection might be made of tracts
while yet unsurveyed, in which event they should be
described in a list with a reasonable degree of certainty [1]
and should be designated according to the survey in a
supplemental list within three months after the plat of
the survey was filed in the local office; and that on the
approval of any list by the Secretary of the Interior [2]
the tracts selected therein should be patented to the
company.

[1] See *West* v. *Rutledge Timber Co.*, 244 U. S. 90, 98; *Rutledge
Timber Co.* v. *Farrell*, 255 U. S. 268.

[2] See *Weyerhaeuser* v. *Hoyt*, 219 U. S. 380, 387; *Payne* v. *New
Mexico*, 255 U. S. 367, 370; *Wyoming* v. *United States*, 255 U. S.
489, 496.

The railway company selected the quarter-quarter in question May 5, 1902, while it was unsurveyed, by filing a suitable list in the proper local land office and paying the officers' fees; and it duly supplemented that list by another, designating the tract according to the survey, within a few days after the plat of the survey was filed in the local office, which was on February 6, 1907. The lists were transmitted by the local officers to the General Land Office and laid before the Secretary of the Interior. He approved them, and on April 13, 1908, a patent was issued to the company.

The tract was open to selection and was duly selected and rightly patented, if at the time of the selection— May 5, 1902—a homestead claim to the land had not been initiated by the acts about to be stated. The plaintiff contended that such a claim had been initiated, and the courts below so held.

In September or October, 1901, W. J. Tincker, who possessed the qualifications named in the homestead law, went to the quarter section which includes this quarter-quarter, blazed a line around the larger tract, and posted notices at its four corners declaring that he claimed it as a homestead. He was there on that occasion two or three hours. In March,[3] 1902, he went to the quarter section again, blazed a trail from an adjacent stream to the nearest corner, cut a few poles and with these laid what appeared to be a cabin foundation two or three poles high. The trail did not touch the quarter-quarter here in question, nor was the pole foundation placed on it. Tincker was there on that occasion for a longer time than before, probably the greater part of a working day. That is all that was done by him prior to the company's selection. Thereafter he went to the quarter section once

---

[3] He testified: "It was about March as near as I can get at it— between February and May."

or twice a year, usually on hunting trips, but did nothing there beyond renewing his notices at the corners. In August, 1906, he sold his so-called possessory claim and improvements. When he first went to the land, and continuously to the time he sold, he was residing, with his wife and children, at Maple Falls, a few miles from the land, and was maintaining a home there. At the trial he was a witness for the plaintiff and testified that his intention throughout that period was "to hold" the quarter section, "expecting some day to go up there and live on it."

Tincker sold to W. M. Smithey, who three months later sold to the plaintiff. The last was the only one of the three who made any attempt at establishing a residence on the quarter section. In November, 1906, he did establish a residence on a part of it not here in question; and after the survey he sought and secured a homestead entry on that part at the local land office. He also sought to have the part here in question included in that entry, but failed. 41 L. D. 375. He had no right to have it included unless Tincker's acts prior to the company's selection amounted to the initiation of a homestead claim and thereby excepted the tract from the class of lands open to selection.

In the company's selection list and supporting affidavit nothing was said about Tincker's acts, not improbably because the selecting agent knew nothing about them and found nothing on or in the vicinity of the quarter-quarter indicative of a homestead settlement or occupancy. When the plaintiff, in 1907, applied to make his homestead entry and to include this quarter-quarter therein he based his application on his own settlement in November, 1906, and said nothing about a prior claim by Tincker. That was the situation when the patent issued to the company. Afterwards the plaintiff requested that a suit be brought by the United States to cancel the

patent on the grounds that the company in making its selection had not disclosed Tincker's acts and that the land officers issued the patent without knowledge of those acts; but the Secretary of the Interior declined to recommend such a suit. The plaintiff brought the present suit in his own right in 1919—eleven years after the issue of the patent, during all of which the company had been regularly paying state and county taxes on the tract.

The homestead law—putting aside special provisions without bearing here—accords to every person of stated qualifications the privilege of acquiring title to a quarter section, or less, of "unappropriated public lands" by settling thereon and continuously residing on, improving and cultivating the same for a prescribed period. The original law was confined to surveyed lands and required that the claims be initiated by an entry made at the local land office, which was to be followed within a reasonable time by actual settlement, residence, etc. Act May 20, 1862, c. 75, §§ 1, 2, 12 Stat. 392; Rev. Stat. §§ 2289, 2290; Act March 3, 1891, c. 561, 26 Stat. 1098. Afterwards a provision was added permitting claims to be initiated, as respects either surveyed or unsurveyed lands, by settlement and providing, where that was done, that record entry should be sought within three months after settlement if the land was surveyed, or, if unsurveyed, within a like period after the survey was made and the plat was filed in the local office. Act of May 14, 1880, c. 89, § 3, 21 Stat. 140. The term "settlement" is used as comprehending acts done on the land by way of establishing or preparing to establish an actual personal residence—going thereon and, with reasonable diligence, arranging to occupy it as a home to the exclusion of one elsewhere. The law makes it plain that there must be a definite purpose "in good faith to obtain a home" by proceeding "faithfully and honestly" to comply with "all the requirements." And the decisions made and in-

structions issued by the officers charged with its administration show that they uniformly have taken the position that a claim cannot be initiated by asserted acts of settlement which are only colorable and done with a purpose to hold the land for speculation or while maintaining an actual residence elsewhere.[4] The instructions say: "Settlement is initiated through the personal act of a settler placing improvements on the land or establishing a residence thereon. . . . When settlement is made on unsurveyed lands the settler must plainly mark the boundaries of all land claimed. Within a reasonable time after settlement actual residence must be established on the land and continuously maintained."

The decisions of this Court have established the principle that one who, in response to the invitation in the homestead law, actually settles on the public lands in an honest effort to acquire a home should be dealt with leniently and not subjected to the loss of his toil and efforts through any mistake or neglect of the officers or agents of the Government. *Ard* v. *Brandon,* 156 U. S. 537, 543; *Northern Pacific R. R. Co.* v. *Amacker,* 175 U. S. 564, 567; *Tarpey* v. *Madsen,* 178 U. S. 215, 220; *Nelson* v. *Northern Pacific Ry. Co.,* 188 U. S. 108, 123;

---

[4] *Amley* v. *Sando,* 2 L. D. 142; *McLean* v. *Foster,* 2 L. D. 175; *Seacord* v. *Talbert,* 2 L. D. 184; *Howden* v. *Piper,* 3 L. D. 162; *Witter* v. *Rowe,* 3 L. D. 449; *Atterbery's Case,* 8 L. D. 173; *Fuller* v. *Clibon,* 15 L. D. 231, 233; *Northern Pacific R. R. Co.* v. *Grimes,* 24 L. D. 452; *Hastings and Dakota Ry. Co.* v. *Grinden,* 27 L. D. 137; *O'Brien* v. *Chamberlin,* 29 L. D. 218; *Meyer* v. *Northern Pacific Ry. Co.,* 31 L. D. 196; *Chainey's Case,* 42 L. D. 510; *Lias* v. *Henderson,* 44 L. D. 542; Instructions of May 25, 1880, 2 Copp's P. L. L. 510; General Circular of March 1, 1884, pp. 11 et seq.; General Circular of January 1, 1889, pp. 13 et seq.; General Circular of January 25, 1904, p. 14; Suggestions to Homesteaders, 37 L. D. 639–640; 40 L. D. 42; 43 L. D. 3; 44 L. D. 93; 48 L. D. 391. And see *United States* v. *Mills,* 190 Fed. 513, 516; *Bratton* v. *Cross,* 22 Kan. 673; *Mosely* v. *Torrence,* 71 Cal. 318; *Small* v. *Rakestraw,* 196 U. S. 403.

*Oregon and California R. R. Co.* v. *United States (No. 1)*, 189 U. S. 103, 114; *St. Paul, Minneapolis and Manitoba Ry. Co.* v. *Donohue*, 210 U. S. 21, 33. But its decisions also show that this salutary rule does not excuse substantial failures to comply with the requirements respecting the initiation of such a claim or accord to it a preference over other claims lawfully acquired and prior in time. *Maddox* v. *Burnham*, 156 U. S. 544, 548; *Northern Pacific R. R. Co.* v. *Amacker, supra; Weyerhaeuser* v. *Hoyt*, 219 U. S. 380, 387, *et seq.; Northern Pacific Ry. Co.* v. *Wass*, 219 U. S. 426; *Svor* v. *Morris*, 227 U. S. 524, 527; *Northern Pacific Ry. Co.* v. *Houston*, 231 U. S. 181.

The Supreme Court of the State rightly recognized that the plaintiff's claim was initiated long after the company's selection at the local land office, and therefore that the real question was whether Tincker's asserted acts prior to that selection amounted to the initiation of a homestead claim. If they did, the tract in dispute was not subject to selection under the Act of 1892; otherwise it was. The important words of the Act are, public lands "to which no adverse right or claim shall have attached or have been initiated at the time of the making of such selection." The Supreme Court of the State held that Tincker's acts " were not sufficient to initiate a bona fide settlement," but concluded with some hesitation that they nevertheless took the tract out of the class of lands subject to selection.

We agree that Tincker did not make a *bona fide* settlement, and we are further of opinion that his acts fell so far short of such a settlement that they did not amount to the initiation of a claim in any admissible view of the homestead law or the Act of 1892. He did nothing indicative of a present purpose to establish a home on the quarter section. He started no real improvements, made no preparations for living there, did not attempt to reside there and did not take his family there; but confined himself to minor acts calculated merely to deter others from

initiating claims. In the seven or eight months preceding the company's selection, he was on the land but twice—less than a day each time. His subsequent conduct, if we turn to it, is equally persuasive that he was without a present purpose to make the place a home. He merely visited it once or twice a year, usually on hunting trips, and on those visits only renewed the notices intended to deter others. Considering what he did and his testimony that he was expecting from his first trip in 1901 to his sale in 1906 that "some day" he would go there to live, we think it apparent that his asserted settlement, even if not a myth in his own mind, fell pronouncedly short of satisfying the requirements of the homestead law in respect of the initiation of a claim, and so did not except the quarter-quarter in question from the company's right of selection under the Act of 1892. He endeavored in his testimony to attribute his omissions to a temporary withdrawal of the land and the surrounding area pending an inquiry as to whether they should be included in an existing forest reserve. But that withdrawal—it later was revoked—could not have been a factor in the matter, because the withdrawal order when produced in evidence disclosed that it was made more than a year after his asserted settlement and more than six months after the company's selection, and that it contained a provision declaring that *bona fide* settlements and valid claims were not affected by it.

If, while maintaining a home at Maple Falls, Tincker could initiate a homestead claim by acts such as are disclosed here, and thus hold the land against others desiring to initiate claims, the way was open for him similarly to make a colorable appropriation of many tracts in that timber region and thus to exact tribute from intending settlers and claimants. His acts, if effective against the company's right of selection, would be equally an obstacle to the initiation of homestead settlement claims,

which is admissible only in respect of unappropriated
public lands.

The state court regarded its conclusion as deriving some
support from cases in this Court; but we think the cases
cited are not susceptible of that interpretation. All are
cases where the individual claim which operated to de-
feat the railroad claim or selection was prior in time and
had been initiated either by an entry at the land office
or by an actual *bona fide* settlement. *Kansas Pacific Rail-
way Co.* v. *Dunmeyer,* 113 U. S. 629, and *St. Paul, Minne-
apolis and Manitoba Ry. Co.* v. *Donohue,* 210 U. S. 21,
are typical of all. In both a homestead claim prior in
time was involved. In the first it had been initiated by an
entry at the land office, and in the second by actual set-
tlement and occupancy in good faith. In both it was in
existence when the right of the railroad company became
fixed, if fixed at all; and the ruling was that such a claim
existing at that time excepted the land—from the com-
pany's grant in one case and from its right of lieu selec-
tion in the other—and that a subsequent abandonment,
relinquishment or failure to comply with the law on the
part of the homestead claimant neither obviated the ex-
ception nor entitled the company to the land—under the
grant in one case and the selection in the other. We per-
ceive nothing in either case which makes for the view
that acts which fall far short of initiating a claim, in either
mode, work such an exception.

The selection in *St. Paul, Minneapolis and Manitoba
Ry. Co.* v. *Donohue* was under the Act of 1892, now be-
fore us, and was of unsurveyed land. When it was made
a qualified claimant, who had settled theretofore and
given notice of the extent of his claim, was residing on,
occupying and improving the land and in good faith con-
forming to the homestead requirements. Subsequently
he died, and his mother as sole heir sold his possessory
claim and improvements to Donohue, who made a timber

and stone entry of the land after the survey. This Court, after carefully pointing out that the homestead claim was lawfully initiated, held that the land was excepted from the right of selection and therefore that the selection was of no avail. Most of the discussion in the opinion was to no purpose if, as is contended here, it was immaterial whether the homestead claim was initiated in substantial conformity to the homestead requirements.

A selection of unsurveyed land under the same Act was involved in *Great Northern Ry. Co.* v. *Hower,* 236 U. S. 702, and was sustained against an asserted prior homestead claim on the ground that, while the claimant had put a small barn on the tract and had cut a trail across it prior to the selection, he had never resided thereon or shown any purpose to do so, but had been maintaining a home on other land not even contiguous to it.

The *Donohue Case* and the *Hower Case* taken together illustrate the principle of prior cases and show how it should be applied here.

　　　　　　　　　　　　　　*Decree reversed.*