**WESTLING v. UNITED STATES.**
No. 9360.

Circuit Court of Appeals, Eighth Circuit.
July 29, 1932.

Hosp & Vesely, of Minneapolis, Minn., for appellant.

Lewis L. Drill, U. S. Atty., and O. A. Blanchard, Asst. U. S. Atty., both of St. Paul, Minn.

Before STONE and KENYON, Circuit Judges, and OTIS, District Judge.

KENYON, Circuit Judge.

The United States brought this action against appellant, Victor Westling, to quiet title to and recover possession of some tracts of land comprising about ninety-six acres, located within what was formerly the Leech Lake Indian Reservation in Minnesota. The tracts involved, known as lots numbered 10, 11, and 12, in section 25, and lot 2 in section 36, all in township 143 north, range 29, west of the Fifth P. M. in Cass county, Minn., are located between the meander line of the original survey made in 1873, and the Lake Shore of Leech Lake, and are situated on what is known as Sugar Point. The case was tried upon a stipulation of facts, and the trial court made findings of fact and announced rules of law, upon which it based a decree for the United States. These lands originally formed part of the Leech Lake Indian Reservation and were ceded, with certain provisions and exceptions designed to protect the rights of the Indians to the United States in trust by the Leech Lake Band of Chippewa Indians interested therein in March, 1890. They were duly allotted to certain Indians belonging to said band, as follows:

"On September 6, 1927, said Lot Number Ten (10), was allotted to one Bay-Bah-Maush.

"On October 8, 1925, said Lot Number Eleven (11), was allotted to one Quay-Quay-ke-je-woun-oke.

"During the year 1925, said Lot Number Twelve (12), was allotted to one Way-dub-ish-quay-jeence; later on, such allotment was cancelled, and on or about February 21, 1927, said Lot was re-allotted to said Way-dub-ish-quay-jeence and that in connection therewith, there was allotted to the same allottee said Lot Number Two (2), in Section Number Thirty-six (36)."

Said allottees received trust patents from the United States in accordance with its laws and treaties. They had not settled upon the lands allotted prior to the allotments, and two of them never resided thereon. The other did during a portion of the time subsequent to the allotment. The reason for these allotments is set forth in the letter of the Assistant Commissioner of the General Land Office of February 13, 1926, as follows: "The original allotments of these Indians were made with the understanding that the lands allotted were along the lake shore where in fact they are shown by the resurvey to be some distance from the lake, and as it was the desire of the Indians to obtain lands abutting on the waters, the relinquishments of the former allotments were accepted in part and the Indians were allotted the Lieu land described above."

In June, 1920, appellant went upon this land with his family, has resided thereon ever since, and has made such improvements as would be required under the homestead laws of the United States if a homestead entry had been made. He believed he would be permitted to acquire said lands later under the homestead laws. The original survey of 1873, made under authority of the Treaty of 1855 (10 Stat. 1165), erroneously omitted the lands in question. Appellant on June 10, 1920, joined with others in making request that the lands on Leech Lake within the former Leech Lake Indian Reservation be resurveyed. Arrangements were then in progress by the Land Department at the request of the Commissioner of Indian Affairs so to do, and that survey was completed December 17, 1923. After the allotments covering these tracts had been made, appellant filed with the Land Office a protest against their allowance and a request that he might be permitted to make proof under the homestead laws of the United States of his right to all the lands referred to. This protest was dismissed by the Commissioner of the General Land Office. Appeal was then taken to the Secretary of the Interior, and the action of the Commissioner was affirmed. The trial judge set forth his conclusions as follows:

"1. Through delays incident to resurvey and to adjustment of Indian claims, and by order of the proper officers having such mat-

ters in charge, the particular lands in question have never been opened to settlement or entry.

"2. Defendant has never filed, or attempted to file, any homestead application covering said lands, or any part thereof.

"3. In due course, the lands in question have been regularly allotted to persons of Indian blood who are now the beneficial owners thereof.

"4. The officers of the Land Department and the Secretary of the Interior committed no errors of law in connection with the matters in hand."

It is the theory of appellant that he has done all that is required of him under the homestead laws, and that by virtue thereof he has an equitable title in the lands; that the government holds them in trust for him, and that such title cannot be destroyed by the Secretary of the Interior making allotments to these Indians; that the cession and relinquishment of these tracts to the government by virtue of the Nelson Act of January 14, 1889, approved by the President March 4, 1890 (25 Stat. 642), completely extinguished the Indian title, except that any Indian "residing on any of said reservations may, in his discretion, take his allotment * * * where he lives * * * instead of being removed"; that, after such extinguishment of the Indian rights, the land became public land subject to disposition under the homestead laws.

Some reference to statutes, treaties, and decisions of the General Land Office seems necessary. The treaties of August 2, 1847 (9 Stat. 904), and February 22, 1855 (10 Stat. 1165) dealt with the lands of the Chippewa Indians.

Article 2 of the Treaty of February 22, 1855, provided: "There shall be, and hereby is, reserved and set apart, a sufficient quantity of land for the permanent homes of the said Indians; the lands so reserved and set apart, to be in separate tracts, as follows, viz. * * * "

The Leech Lake Indian Reservation was one of the reservations thus created.

By an executive order, May 26, 1874, President Grant withdrew from sale, entry, or other disposition all the land embraced in township 143 north, range 29 west, in the state of Minnesota. The lands in question here are in said township. This order of President Grant has apparently never been modified or repealed, unless that result was accomplished by inference in the acts of 1902 and 1908, to which we hereinafter advert.

This withdrawal in effect added the withdrawn lands to the Leech Lake Indian Reservation created by the treaty of February 22, 1855. In a letter from the Acting Assistant Commissioner of the General Land Office on September 29, 1919, to Congressman Walter H. Newton of Minnesota, who had taken up the matter with the Department on behalf of appellant, this executive order is referred to as follows: "In reply, I have the honor to advise you that, by executive order of May 26, 1874, all the land embraced in township 143 North, range 29 west together with other lands, were withdrawn from sale, entry, or other disposition and set apart for the use of the Pillager and Lake Winnibigoshish bands of said Indians."

Our conclusion in this case is not based on the effect of this order but on subsequent legislation and events.

The Act of February 8, 1887 (24 Stat. 388) empowered the Secretary of the Interior to prescribe rules and regulations for the making of allotments and gave a certain legislative approval to the executive order of President Grant. It provided in section 1: "That in all cases where any tribe or band of Indians has been, or shall hereafter be, located upon any reservation created for their use, either by treaty stipulation or by virtue of an act of Congress or executive order setting apart the same for their use, the President of the United States be, and he hereby is, authorized, whenever in his opinion any reservation or any part thereof of such Indians is advantageous for agricultural and grazing purposes, to cause said reservation, or any part thereof, to be surveyed, or resurveyed if necessary, and to allot the lands in said reservation in severalty to any Indian located thereon in quantities as follows. * * * "

Section 5 of the same act (25 USCA § 348) provided: "That at any time after lands have been allotted to all the Indians of any tribe as herein provided, or sooner if in the opinion of the President it shall be for the best interests of said tribe, it shall be lawful for the Secretary of the Interior to negotiate with such Indian tribe for the purchase and release by said tribe, in conformity with the treaty or statute under which such reservation is held, of such portions of its reservation not allotted as such tribe shall, from time to time, consent to sell, on such terms and conditions as shall be considered just and equitable between the United States and said tribe of Indians, which purchase shall not be complete until ratified by Congress, and the form and manner of executing such release.

shall also be prescribed by Congress: Provided, however, That all lands adapted to agriculture, with or without irrigation so sold or released to the United States by any Indian tribe shall be held by the United States for the sole purpose of securing homes to actual settlers and shall be disposed of by the United States to actual and bona fide settlers only in tracts not exceeding one hundred and sixty acres to any one person, on such terms as Congress shall prescribe, subject to grants which Congress may make in aid of education."

The Nelson Act of January 14, 1889 (25 Stat. 642), is one of great importance. The Supreme Court in La Roque v. United States, 239 U. S. 62, 65, 36 S. Ct. 22, 24, 60 L. Ed. 147, speaks of this act as follows: "The Nelson act embodied a plan for securing a cession by the several bands of Chippewa Indians in Minnesota of all reservations occupied by them except portions of the White Earth and Red Lake reservations required to make allotments, for removing to the White Earth Reservation all the bands save those on the Red Lake Reservation, for making allotments in severalty in the unceded lands, and for disposing of the ceded lands, placing the net proceeds at interest and distributing them in severalty at the end of fifty years." In Fairbanks v. United States, 223 U. S. 215, 217, 32 S. Ct. 292, 294, 56 L. Ed. 409, the court said: "It is known as the Nelson act, and provided for the appointment by the President of three commissioners to negotiate with the different bands of Chippewas for the cession of all their lands except so much of the White Earth and Red Lake Reservations as the commissioner should deem necessary for allotments to be made to the Indians. It also provided for the removal to the White Earth Reservation of all but Red Lake Indians, and for allotments to such Indians on White Earth Reservation under the direction of such commissioners."

Section 1 of the Nelson Act provided: "That the President of the United States is hereby authorized and directed, within sixty days after the passage of this act, to designate and appoint three Commissioners, one of whom shall be a citizen of Minnesota, whose duty it shall be, as soon as practicable after their appointment, to negotiate with all the different bands or tribes of Chippewa Indians in the State of Minnesota for the complete cession and relinquishment in writing of all their title and interest in and to all the reservations of said Indians in the State of Minnesota, except the White Earth and Red

Lake Reservations, and to all and so much of these two reservations as in the judgment of said commission is not required to make and fill the allotments required by this and existing acts, and shall not have been reserved by the Commissioners for said purposes, for the purposes and upon the terms hereinafter stated; * * * Provided further, That in any case where an allotment in severalty has heretofore been made to any Indian of land upon any of said reservations, he shall not be deprived thereof or disturbed therein except by his own individual consent separately and previously given, in such form and manner as may be prescribed by the Secretary of the Interior. * * * "

The cession contemplated by this provision was consummated by March 4, 1890.

Section 3 provided: "That as soon as * * * the cession and relinquishment has been obtained, approved, and ratified, as specified in section one of this act, all of said Chippewa Indians in the State of Minnesota, except those on the Red Lake Reservation, shall, under the direction of said commissioners, be removed to and take up their residence on the White Earth Reservation, and thereupon there shall, as soon as practicable, under the direction of said commissioners, be allotted lands in severalty to the Red Lake Indians on Red Lake Reservation, and to all the other of said Indians on White Earth Reservation * * * [in conforming with the Act of Feb. 8, 1887, supra]; and all allotments heretofore made to any of said Indians on the White Earth Reservation are hereby ratified and confirmed with the like tenure and condition prescribed for all allotments under this act: Provided, however, That the amount heretofore allotted to any Indian on White Earth Reservation shall be deducted from the amount of allotment to which he or she is entitled under this act: Provided further, That any of the Indians residing on any of said reservations may, in his discretion, take his allotment in severalty under this act on the reservation where he lives at the time of the removal herein provided for is effected, instead of being removed to and taking such allotment on White Earth Reservation."

It is apparent that the purpose of this act was to transfer the Chippewa Indians from the various reservations, except the Red Lake Reservation, to the White Earth Reservation, and give them allotments there. However, any Indian resident of any such reservations could take an allotment on the reservation where he lived at the time of the attempted removal. This did not mean that he must

take as part of his allotment any particular land. It must be assumed that the allotments made to the Indians, nothing contrary appearing on the record, were made to those who lived on the ceded reservations, and that they were entitled thereto instead of being removed to the White Earth Reservation. Such lands of the reservations as were not reserved or allotted were to be surveyed and classified as pine or agricultural lands. The pine lands were to be sold under the provisions of section 5, the proceeds to be held in trust for the Chippewa Indians, United States v. Mille Lac Band of Chippewa Indians, 229 U. S. 498, 33 S. Ct. 811, 57 L. Ed. 1299, while as to the agricultural lands remaining section 6 applied, in which occurs the following: "That when any of the agricultural lands on said reservation not allotted under this act nor reserved for the future use of said Indians have been surveyed * * * the said agricultural lands so surveyed, shall be disposed of by the United States to actual settlers only under the provisions of the homestead law."

It is quite evident that this act did not extinguish all the interest of the Indians in the Leech Lake Reservation lands.

The Act of June 27, 1902 (32 Stat. 400, 403), amendatory to the Act of 1889, provided, section 2: "As soon as practicable after the passage of this Act the Secretary of the Interior shall open to homestead settlement, as herein provided, the lands on all the reservations, or portions of reservations, which have been ceded to the United States by the Chippewa Indians in Minnesota, including the four reservations last aforesaid, which have been examined and found to be agricultural lands, and shall immediately proceed to have examined, as herein provided, the remaining lands, and shall without delay open to homestead settlement those found to be agricultural lands."

Section 5 provided: "That the Secretary of the Interior shall proceed as speedily as practicable to complete the allotments to the Indians, which allotments shall be completed before opening the agricultural land to settlement."

The Act of May 23, 1908 (35 Stat. 268), was also amendatory of the Nelson Act. Section 4 thereof provided: "That all land and any of said reservations, the Winnibigoshish Indian Reservation, Cass Lake Indian Reservation, Chippewas of the Mississippi Reservation, or Leech Lake Indian Reservation not included in the National Forest hereby created as above described, heretofore classified or designated as agricultural lands, is hereby declared to be open to homestead settlement; and any of said land which has been classified as timber land shall be open to homestead settlement as soon and as fast as the timber is removed therefrom, in conformity with the homestead law, except that none of said land shall be disposed of except on payment of one dollar and twenty-five cents per acre."

This act seems to be the only one that without some affirmative action on the part of the Secretary of the Interior opened certain reservation lands to homestead settlement, but only such agricultural lands were so opened as had been "heretofore classified or designated as agricultural lands."

These various acts show a purpose on the part of Congress to open these Indian lands to homestead settlement under the administrative discretion and affirmative action of the Secretary of the Interior, subject, however, to any administrative transfer of some of them into a forest reservation, and subject to the allotment out of any of them of parcels to individual Indians. They also show that Congress was as solicitous of the welfare of the Indians as of homestead settlers.

On April 3, 1925, the tracts in question here upon which appellant had settled in 1920 were classified as agricultural land. On May 7, 1925, Congressman Knutson of Minnesota, to whom appellant had written concerning the matter, wrote him stating that he was advised that the receiver of the Cass Lake, Minn., land office had recommended that the tract on which he had settled be opened for settlement. On June 11, 1925, the Commissioner of Indian Affairs addressed a letter to the General Land Office recommending that these lands be not opened to homestead entry and settlement until the rights of individual Indians thereto were adjudicated. On this recommendation the trust patents to tracts 11 and 12 here involved were issued.

In the letter of July 6, 1927, from the Commissioner of the General Land Office to the register of the land office at Cass Lake, Minn., is this: "Moreover, the Department, on July 13, 1926, approved the recommendation of the Commissioner of Indian Affairs that all Chippewa lands in the State of Minnesota not classified as swamp which were ceded to the United States under the provisions of the act of January 14, 1889, supra, be withheld from settlement, entry, or other disposition until those Indians whose present selections include lands classified as

swamp have been allotted other lands in lieu thereof."

It is not clear from the record as to whether the Indian allottees selected this land themselves or whether the tracts were selected for them by the government acting as guardian for its wards, nor is it important. The allottees were not questioning the allotments. Presumably the governmental officials acted according to law, and presumably the allottee adopted the selection which was made for him. The fact is that during 1925 and in September, 1927, these lands were allotted under the authority of the Nelson Act to the three Indians hereinbefore named. Appellant protested these allotments. The Commissioner of the General Land Office decided against him. He appealed to the Secretary of the Interior, and the Commissioner's decision was affirmed by the Department of the Interior in a decision March 15, 1928, by the First Assistant Secretary of the Interior, Mr. Finney, in which it is said: "The fact is that there has been no time when these and similar lands bordering on Leech Lake were open to the initiation of homestead claims; they have never been opened to homestead settlement and entry in accordance with the Chippewa act of 1889 but have been subject to allotment and allotments thereon have been made to the Indians to whom trust patents have been issued. Therefore, there is nothing further that can be done in respect of Westling's protest and the action of the Commissioner of the General Land Office dismissing the same is accordingly hereby affirmed."

■■ The Secretary of the Interior had no right to open these lands for settlement until they had "been examined and found to be agricultural lands." Act June 27, 1902. He was admonished by this act not to open the agricultural lands to settlement until the allotments to the Indians had been completed, and they were not so designated until April 3, 1925. Appellant settled on them in June, 1920, five years before they were declared to be agricultural lands, and, when he settled, they had not been surveyed, and were not a part of the public domain subject to the homestead laws. They were not subject to sale, entry, or disposal. They were withheld by the Department of the Interior from settlement or entry until adjustments with respect to Indian allotments should be made.

Appellant claims he settled on these lands in good faith, with a bona fide intention subsequently to enter them under the homestead acts, that he expended toil and money in improving the same and in endeavoring to make a home for his family. It is true that one who settles on public land with a bona fide intention to secure a home and expends toil and money in so doing "should be dealt with leniently" as said by the Supreme Court in Great Northern Railway Company v. Reed, 270 U. S. 539, 546, 46 S. Ct. 380, 383, 70 L. Ed. 721, but it is also said in that case, after referring to a number of decisions of the Supreme Court concerning the toil and efforts of the bona fide settler on public lands being lost through mistake or neglect of the officers or agents of the government: "But its decisions also show that this salutary rule does not excuse substantial failures to comply with the requirements respecting the initiation of such a claim or accord to it a preference over other claims lawfully acquired and prior in time." In Maddox v. Burnham, 156 U. S. 544, 545, 15 S. Ct. 448, 449, 39 L. Ed. 527, the court said: "Leniently as the conduct of a settler is always regarded by the courts, it cannot be that such leniency will tolerate the omission by him of any of the substantial requirements of the statute in respect to the creation of rights in the public lands." It appears from this record that appellant never made a homestead entry as to the land in controversy. He was advised on April 18, 1924, by Congressman Knutson, who was keeping in touch with the matter, that it would be necessary for him to "file claim for homestead to preserve any rights that you may have acquired."

What equitable rights under the circumstances here presented has appellant? Has he any vested rights in these lands?

As far back as Frisbie v. Whitney, 9 Wall. 187, 195, 19 L. Ed. 668, the court set forth with approval from the opinion of Attorney General Cushing given in 1856 the following: "Persons who go upon the public land with a view to cultivate now, and to purchase hereafter, possess no rights against the United States, except such as the acts of Congress confer; and these acts do not confer on the preemptor, in posse, any right or claim to be treated as the present proprietor of the land, in relation to the government." And also from an opinion of Attorney General Bates: "A mere entry upon land, with continued occupancy and improvement thereof, gives no vested interest in it. It may, however, give, under our National land system, a privilege of pre-emption. But this is only a privilege conferred on the settler to purchase land in preference to others. * * * His settlement protects him from intrusion or purchase by others, but confers no right

against the government." In Shepley et al. v. Cowan et al., 91 U. S. 330, 338, 23 L. Ed. 424, the court said: "Nor is there anything in this view in conflict with the doctrines announced in Frisbie v. Whitney, 9 Wall. 187, 19 L. Ed. 668, and the Yosemite Valley Case, 15 Wall. 77, 21 L. Ed. 82. In those cases the court only decided that a party, by mere settlement upon the public lands, with the intention to obtain a title to the same under the preemption laws, did not thereby acquire such a vested interest in the premises as to deprive Congress of the power to dispose of the property." In Buxton v. Traver, 130 U. S. 232, 235, 9 S. Ct. 509, 510, 32 L. Ed. 920, the court said: "No portion of the public domain, unless it be in special cases not affecting the general rule, is open to sale until it has been surveyed and an approved plat of the township embracing the land has been returned to the local land-office. A settlement upon the public lands in advance of the public surveys is allowed to parties who in good faith intend, when the surveys are made and returned to the local land-office, to apply for their purchase. If, within a specified time after the surveys, and the return of the township plat, the settler takes certain steps,—that is, files a declaratory statement, such as is required when the surveys have preceded settlement, and performs certain other acts prescribed by law,—he acquires for the first time a right of pre-emption to the land; that is, a right to purchase it in preference to others. * * * The United States make no promise to sell him the land, nor do they enter into any contract with him upon the subject." In Douglass v. Rhodes (D. C.) 280 F. 230, Judge Trieber says that it has been decided so many times that a pre-emptor has no vested right that it has ceased to be an open question.

In Wadkins v. Producer Oil Company, 227 U. S. 368, 374, 33 S. Ct. 380, 383, 57 L. Ed. 551, arising under section 3 of the Act of May 14, 1880 (43 USCA § 166), providing that settlers might file homestead entries upon unsurveyed public land, and that their right should relate back to act of settlement for its initiation, as is urged in behalf of appellant here, the court said: "There can be no doubt that Wadkins' inchoate right was initiated by his settlement, and that, as between him and any intervening claimant, his perfected right evidenced by the patent related back to the time of his settlement, * * * but he did not acquire any vested interest in the land until he had fully complied with the provisions of the homestead law and submit-

ted proof thereof at the local office. Prior to that time his right was essentially inchoate and exclusively within the operation of the laws of the United States, and those laws, as we have seen, fully dealt with the subject of who should be the beneficiary of a compliance with them, thereby excluding state laws from that field."

We quote from 22 Ruling Case Law, § 11, p. 248, as follows: "Before an act withdrawing lands from sale can be held to impair any vested right of an applicant for purchase, he must have done everything required by law to secure such right. Until then no contract right of the applicant is violated by such legislation; nor can acts done by a settler, with a view to pre-emption, impair in any respect the power of Congress to withdraw the land from sale for the uses of the government, or to dispose of it to other persons," and from section 25, p. 262: "Although the title to public land does not finally pass from the United States until the issuance of a patent, the receiver's receipt, issued to a homestead entryman in possession, constitutes ample title to enable him to maintain or defend any suit concerning the land. He does not, however, acquire any vested rights in the land until he has made entry at the proper land office, and obtained a certificate of entry. Before then the land is subject to the absolute disposing power of Congress."

In Ard v. Brandon, 156 U. S. 537, 15 S. Ct. 406, 39 L. Ed. 524, relied on by appellant, Ard had entered in good faith upon land which was within the indemnity limits, though not within the place limits, of a railroad grant. At the time he demanded the right to enter the one hundred and sixty acres in question as a homestead it had not been withdrawn from public entry and settlement. That is not the situation here. The decision of the court was based on the fact that the land had not been withdrawn by the Land Department from entry and settlement. In Maddox v. Burnham, 156 U. S. 544, 545, 15 S. Ct. 448, 449, 39 L. Ed. 527, also relied on by appellant, the facts were practically the same as in Ard v. Brandon, supra. In deciding against the defendant on the facts, the court said: "At the time of these transactions the mere occupation of land with a purpose at some subsequent time of entering it for a homestead gave to the party so entering no rights. The law in force (12 Stat. 392 [c. 75]) made the entry at the land office the initial fact." In Wood v. Beach, 156 U. S. 548, 551, 15 S. Ct. 410, 411, 39 L. Ed. 528, upon the admitted facts the court said: "It is clear

that Mr. Wood acquired no equitable rights by his occupation and settlement. He went upon lands which were not open to homestead or pre-emption entry, and cannot make his unauthorized occupation the foundation of an equitable title." United States v. Norton, (C. C. A.) 19 F.(2d) 836, 839, seems to be entirely in point in the instant case. There contention was made that under the Act of May 14, 1880 (21 Stat. 141), settlement with the intention of claiming the land under the homestead laws conferred an inchoate right to the land. The court said:

"The settlement does not confer on the settler any vested right to the land. It confers on him only a preference over others, in the event the land is thrown open to entry, but does not deprive the government of the right to dispose of the land otherwise than under the pre-emption or homestead laws, or to appropriate it to any public use. * * *

"His occupation of the land confers on him no right, except as against others asserting claims to the land under the public land laws, or under a grant or conveyance by the government, and his possession is in subordination to the right or power of the government, through its officials acting in pursuance of law, to make a use or disposition of the land inconsistent with the acquisition of title to it under the homestead laws."

The allotment to the Indians (wards of the government), title remaining in the United States under the Act of 1887 (24 Stat. 388), until issuance of fee-simple patents, was a disposition inconsistent with action under the homestead laws. The General Land Office declared repeatedly that these lands were not open to homestead entry but were subject to allotment. The order of July 13, 1926, of the Commissioner of the General Land Office withheld rather than withdrew the Chippewa's lands in Minnesota from settlement. The Interior Department held on the appeal from decision of the Commissioner of the General Land Office that these lands had never been open to homestead claims or settlement under the Nelson Act, but were subject to allotment, all of which indicates pretty clearly the construction that the officers of the government charged with control of the public lands, have placed upon the various statutes and treaties. While this construction is not conclusive, as said by the Supreme Court in La Roque v. United States, 239 U. S. 62, 64, 36 S. Ct. 22, 23, 60 L. Ed. 147, it "is entitled to great respect and ought not to be overruled without cogent and persuasive reasons."

It is idle to blink away the fact that appellant knew at all times the position of the government as to these lands. Otherwise he would have attempted to make entry thereon and perform the legal necessities incident to the exercise of homestead rights. In the letter of September 29, 1919, hereinbefore referred to, Congressman Newton was advised by the General Land Office that these lands were subject to disposition for the benefit of the Chippewa Indians under the Nelson Act, and were not subject to settlement or entry. In September, 1920, either appellant or those acting for him were advised that the land upon which he had settled in June, 1920, was not open to entry, and that by settlement thereon he would acquire no rights. The Land Department on July 2, 1921, informed Mr. Ransum who had joined with appellant in an application for a survey of these lands that, if they had settled upon the lands, they had acquired no right to enter the same by reason of said settlement. The record shows that he was continually so advised; further he was advised that he had not made application to enter the same.

Appellant was in no way misinformed or misled by any action of government officials. He received no encouragement from any one in authority. In fact, he received discouragement. He knew when he went upon the land that it was not subject to entry, and he should have known that it might never become subject to entry. It might be selected to be added to the Forest Reservation within the provisions of the Act of June 27, 1902, or it might be allotted to Indians in accordance with the provisions of the Nelson Act, or Congress might by subsequent legislation have established a still further public use for the land inconsistent with its being opened to entry. All he acquired in settling upon the land was a right of priority over other homesteaders "in case the land should at some future time be opened for entry." That is as far as the cases go, and that is as far as his rights go. He acquired no equitable title as against the government. The decision and decree of the trial court were right, and its decree is affirmed.