APRIL TERM, 1944

THE TEXAS COMPANY, a Corporation, Plaintiff and Respondent,

v.

C. F. SIEFRIED, as State Highway Superintendent, and LOUIS J. O'MARR, as State Attorney General, Defendants and Appellants, and

W. A. NORRIS, INC., a Corporation; PETER KIEWIT SONS COMPANY, a Corporation; JAMES CRICK; JIM McKNIGHT; GLEN JONES; TAGGART CONSTRUCTION COMPANY, INC., a Corporation; GUY H. JAMES; NORTHWESTERN ENGINEERING COMPANY, a Corporation; ZIMMIE H. LOWDERMILK; HOYLE A. LOWDERMILK, and W. ELBERT LOWDERMILK, Defendants and Respondents.

(No. 2276; Apr. 11, 1944; 147 P. 2d 837)

143

144

*Louis J. O'Marr*, Atty. Gen., *John J. McIntyre*, Dep-Atty. Gen., and *Arthur Kline*, Asst. Atty. Gen., for defendants and appellants.

*Y. A. Land*, of Denver, Colo., and *Albert D. Walton*, of Cheyenne, for plaintiff and respondent.

*Ray E. Lee*, of Cheyenne, for defendants and respondents.

146

148

## OPINION

RINER, Justice.

This is a proceeding by direct appeal to review a judgment of the district court of Laramie County. The action in that court was commenced by The Texas Company, a Corporation, as plaintiff, against Frank Kelso, as State Highway Superintendent, and Ewing T. Kerr, as State Attorney General, as defendants. Other persons and corporations were also named as defendants but so far as this proceeding is concerned, and the questions at present involved, they may be regarded as aligned with The Texas Company hereinafter usually designated as the "plaintiff". Due to changes in officials during the pendency of this litiga-

tion C. F. Siefried and Louis J. O'Marr were substituted as defendants, the former as State Highway Superintendent, and the latter as State Attorney General, respectively, in lieu of Frank Kelso and Ewing T. Kerr. The substituted officials will usually be subsequently referred to as the "defendants", while the remaining parties defendant will be, for convenience and brevity, usually mentioned hereinafter as the "contractors".

The cause was tried in the district court upon an agreed statement of facts supplemented by oral testimony of witnesses and certain documentary evidence introduced in connection with that testimony. There would appear to be very little if any dispute as to the facts needful to be considered in disposing of this appeal and in substance these may be set forth thus:

The plaintiff, during the period between June 16, 1936, and November 30, 1940, was engaged in the business of producing and refining crude oil in the State of Wyoming, and in marketing gasoline and other refined products obtained from said oil, in this and other states. The contractors were all engaged in the construction of highways in that portion of the federal reservation well known as the Yellowstone National Park, located within the exterior boundaries of the State of Wyoming. Usually this reservation will be mentioned simply as the "park." The plaintiff entered into oral agreements with the several contractors to sell them gasoline for consumption in their road construction work. These contracts made with the plaintiff were similar in character. An estimate was made and submitted to the plaintiff, by the several contractors, of the amount of gasoline each would need in fulfilling their contracts for road construction work as held by each contractor. Whenever the motor fuel was needed the plaintiff's Consignee, here-

inafter described, at Cody, Wyoming, would be notified concerning the amount then desired, which amount thereupon would be hauled by Consignee's own trucks and delivered to the tanks of the several contractors, located in the Park aforesaid, convenient to their work of highway construction.

The gasoline sold and delivered by the plaintiff to the contractors aforesaid was refined from crude oil produced in the so-called Oregon Basin Oil Field, about eighteen miles from the town of Cody, Wyoming, the oil being processed in a refinery plant owned and operated by the plaintiff and which was located on the outskirts of said town.

The plaintiff owned what is designated in the record as a "bulk plant" or station, which was situated about two miles from the town of Cody, and across the Shoshone River therefrom. This bulk station consisted of a warehouse and large tanks for motor fuel including gasoline, located for the most part above the surface of the ground. One of these gas tanks at least was located underground and a motor driven filling station pump was attached thereto for the convenient removal of its contents into truck tanks and other receptacles. This bulk plant or station was near the railroad which served the town of Cody, and was enclosed within a heavy wire fence about six feet high which was provided with a large gate for ingress and egress, and which was usually kept locked.

This bulk plant was about three-fourths of a mile from the plaintiff's oil refinery. Prior to June, 1938, it was operated by one E. L. Trickett and thereafter by one H. E. Siddle. The latter also operated a filling station selling plaintiff's products in the town of Cody. The bulk station had no one in immediate charge of it who stayed there regularly; "the only

time we are there" says Mr. Siddle in his testimony, "is while we are ordering or filling an order and then it is locked up again." The arrangement under which, as between the plantiff and the operator of the bulk' station that plant is run, is designated a "Consignment Agreement," the plaintiff being named as "Consignor" and the operator as "Consignee."

Summarizing, that agreement appointed Siddle "for the sale of Consignor's products at Cody." He was thereby required to "market and distribute petroleum products suplied by Consignor"; to

"Promptly and correctly account, on forms provided by Consignor, for all Consignor's moneys, goods, products, equipment, etc., in his possession, or coming into his custody, and pay Consignor for any shortages which may develop at any time."; to

"sell the products of Consignor for cash, or on credit properly authorized," personally paying for any balance in excess of the credit limit fixed by Consignor; to "bear all expenses" of operating the bulk plant except freight charges on products shipped and taxes on Consignor's merchandise, stock and equipment; to

"At his expense, furnish trucks and other equipment required for the distribution of products hereunder, such trucks and equipment to conform. with Consignor's standards therefor."; to

"At his own expense, hire and pay the wages of all assistants and employes required for the proper and diligent operation of said station, and assume full direction and control over and responsibility for all such assistants and employes; and indemnify and save Consignor harmless from loss arising out of or by virtue of any and all damage to property and/or injury to persons (whether or not such injury result in death) occasioned by the acts of Consignee, his assistants and/or employees."; and to

"accept full and exclusive liability for the payment of any and all premiums, contributions and taxes for workmen's compensation insurance, unemployment insurance and for old age pensions, annuities and retirement benefits, now or hereinafter imposed by or pursuant to federal and state laws, which are measured by the wages, salaries or other remuneration paid to persons employed by Consignee in connection with the performance of this contract; and Consignee further agrees to indemnify and hold Consignor harmless against any liability for any such premiums, taxes or contributions respecting Consignee's employees which may be assessed against Consignor. Consignee further agrees to enter into any agreement that has been or may hereafter be prescribed by any federal or state governmental body or authority in order to effectuate the foregoing purposes."

The Consignor agreed to pay Consignee one and one-half cents per gallon "when product sold is delivered by Consignee's truck." Certain commissions were to be paid Consignee "based on less than carload sales and transfers." Trickett and Siddle operated the bulk station under similar contracts with plaintiff.

It apears that this bulk station sold its gasoline products not only to the contractors aforesaid but also to farmers and ranchmen residing in the vicinity of Cody, Wyoming, who provided their own containers—usually in the form of barrels, each of which held at least 30 gallons—and to garages and other filling stations. These sales were never made in less than 25 gallon lots. Evidently the farmers and ranchmen brought their containers to the bulk plant where they were filled by the operator of the plant. In the case of the garages and filling stations in the town of Cody, the gasoline was drawn from the bulk station tanks into truck tanks and hauled across the river to the town and emptied into the customer's storage tanks. As already indicated, all gasoline handled by

the bulk station in its tanks was obtained from plaintiff's nearby oil refinery. It was, of course, impossible to tell exactly what gasoline would be sold to farmers and ranchmen until their containers were filled at the bulk station, nor that sold to filling stations, garages, and the contractors aforesaid, until the motor fuel had been drawn from the bulk station tanks into Consignee's tank trucks and allotted thereby for delivery as required.

In the case of the contractors, as above described, when they had notified the Consignee of their need of gasoline in connection with their highway construction operations, the motor fuel, after being drawn off into Consignee's truck tanks from the bulk plant's storage tanks, would be hauled from said plant or station to the east entrance of the Park, a distance of about 56 miles, thence to the separate tanks of the contractor or contractors who had requested delivery of the gasoline wherever in the Park and within the exterior boundaries of the State of Wyoming these tanks were located. The Consignee's truck tanks used for the Park business were usually of 1425 and 1000 gallons capacity respectively; they were driven to the place of delivery under their own power; the gasoline they consumed was paid for by the Consignee and he also paid the drivers of the trucks, which vehicles were all owned by him. Upon the truck's arrival at the place of delivery of the gasoline the driver thereof would make out a "regular sales invoice" and, by using carbon sheets, an original and three copies were made. The contractor who had ordered motor fuel, or his representative, was required to sign the invoice. A copy was given to him, the Consignee retained a copy, and two copies went to the plaintiff. The delivery of the gasoline was on a credit basis though sometimes the contractor would give the truck driver

a check in payment for the gasoline, but usually the payment check was mailed directly to the plaintiff. All checks were made payable to the plaintiff. The latter paid the Consignee a commission for every gallon of motor fuel he moved as we have noted above. Other facts shown by the record herein will be mentioned subsequently as they may be deemed pertinent.

The state statutes primarily discussed by the parties in their briefs and at the oral argument of the cause were:

Sec. 2 of Ch. 72, Laws of Wyo. 1935, amending Sec. 115-1102, W.R.S. 1931, as amended by Sec. 2 of Ch. 60, Laws of Wyo. 1933, Special Session, which reads:

"A license tax of four cents per gallon is hereby levied on all gasoline produced, refined, manufactured, blended or compounded, and used within this State and on all gasoline, produced, refined, manufactured, blended or compounded and sold or distributed for sale or use within this state or imported into this State, for sale or use therein, to be collected as hereinafter set forth."

Subdivision (1) of Sec. 1 of Ch. 72, supra, is to this effect:

"The term 'wholesaler' is defined to mean any person, firm or corporation who imports, produces, refines, manufactures, blends or compounds gasoline in the course of any business in the State of Wyoming for use, sale or distribution in this State."

Section 3 of said chapter requires each wholesaler of gasoline engaged in business in the State of Wyoming to make certain monthly statements:

"of all gasoline produced, refined, manufactured, blended or compounded and used within the State, and of all gasoline produced, refined, manufactured, blended and compounded and sold or distributed for sale or use within this State, or imported for sale or use in this State, during the preceding calendar month,"

and pay to the State Highway Superintendent "at the same time the license tax of four cents per gallon on all such gasoline."

Sec. 115-1111 W.R.S. 1931, provides:

"Said gasoline license tax shall not be imposed on gasoline when exported or sold for exportation from the State of Wyoming to any other state or nation."

The State of Wyoming, through the State Highway Department, the branch of our state government charged with the administration of the motor fuel tax laws of this commonwealth, claims that under the quoted language of Sec. 2, of Ch. 72, Laws of Wyo. as amended, supra, a tax should be paid by the plaintiff on the gasoline delivered and sold by it, as described above, to the several contractors who are parties to the litigation. These payments the plaintiff declined to make and brought this action to restrain the State Highway Superintendent and the Attorney General of the State of Wyoming, from enforcing collection of that tax. The District Court granted plaintiff the relief it sought and the State, being dissatisfied with the judgment rendered. in plaintiff's favor, has brought the record here for review as heretofore recited.

So far as the right of the State of Wyoming to tax the gasoline aforesaid, under the state statutes mentioned and quoted above, is concerned the plaintiff asserts that the State does not possess that right, giving as its reasons for this contention that the gasoline in question (a) was sold in the Park, (b) was used in the Park, (c) was distributed for sale or use in the Park, (d) was exported or sold for exportation from the State within the meaning of Sec. 115-1111, supra, and that the Park is not "within" the State within the meaning of Sec. 115-1102, W.R.S. 1931

as amended by the Session Laws of 1933-35, and as quoted above.

It is conceded by the parties to this litigation that the gasoline thus asserted to be tax free was produced, refined, and manufactured in the State of Wyoming, and was not "imported" into the State so as to be affected by the importation clause in said Sec. 115-1102.

The verified monthly reports of the plaintiff to the State Highway Gasoline Tax Division, and received in evidence on the trial below, would appear to claim exemption for the gasoline involved in this lawsuit for the stated reason that the gasoline was exported from the State of Wyoming. No other exemption claim seems to be made in those reports. But we do not think that Sec. 115-1111, the exemption export section of our gasoline tax law, is at all applicable here. No authority is called to our attention which holds that the Park is a "state or nation" within the meaning of the section of our law last mentioned. On the contrary, plaintiff itself refers us to Talbott v. Board of County Comrs. of Silver Bow County, 139 U. S. 438, 11 S. Ct. 594, 35 L. Ed. 210, where it was stated that:

"while the word 'State' is often used in contradistinction to 'Territory,' yet in its general public sense, and as sometimes used in the statutes and the proceedings of the government, it has the larger meaning of any separate political community, including therein the District of Columbia and the Territories, as well as those political communities known as States of the Union. Such a use of the word 'State' has been recognized in the decisions of this court."

We are unable to perceive that the Park is a "separate political community" such as the Supreme Court of the United States had in mind when it employed the

language last above quoted. In construing statutes, words or phrases should generally be given their natural, ordinary, and customary meaning. Morrison-Knudsen, Inc. et al. v. State Board of Equalization, 58 Wyo. 500 at 512; 135 Pac. (2d) 927; Ward v. Board of Commissioners, 36 Wyo. 460, 256 Pac. 1039; State ex rel. Murane v. Jack, 52 Wyo. 173 at 183, 70 Pac. (2d) 888; Board of Commissioners v. Blakely, 20 Wyo. 259, 123 Pac. 72; 59 C. J. 975. See also W.R.S. 1931, Sec. 112-101.

Plaintiff asserts that " the plain purpose of Sec. 115-1111, supra, was to exempt gasoline when exported or sold for exportation to any territory or area which was not subject to the jurisdiction of the State of Wyoming." One answer to this contention is that the statute in question does not so read. It would have been quite easy for the State Legislature to have said what plaintiff urges should be regarded as the purport of the statute. This, the law making body did not see fit to do. Again, unquestionably, this section of the law provides the exemption of certain motor fuel from the operation of our State gasoline taxation statute, and this Court has held that enactments of this character are to be strictly construed. See State ex rel. Goshen Irrigation District v. Hunt, 49 Wyo. 497, 57 Pac. (2d) 793.

The defendants and appellants advance the view that a fair and proper construction of Sec. 2 of Ch. 72, Laws of Wyo. 1935, quoted above, establishes that the transactions hereinbefore described are taxable by the State under that section. While frankly conceding that, under the arrangement of the clause in said section, "and sold or distributed for sale or use within this State" the phrase "within this State" may modify either the words "for sale or use" or the verbs

"sold" or "distributed" without doing violence to the grammatical interpretation of these words, yet they insist that a careful analysis of the statute in its entirety leads directly to the conclusion that the Legislature intended the phrase "within this State" to modify the verbs "sold or distributed." In other words, by the language employed in the Act it was designed that the gasoline tax should be levied on any gasoline used within the State, sold within the State, or distributed within the State for sale or use; that this tax should be levied whether the subsequent sale took place within or without the State, unless the gasoline was exempted under Sec. 115-1111, supra, as an export. That section, as we view it and as already indicated, we deem not involved in this lawsuit.

In this connection and in support of the contention suggested in the last paragraph, it is pointed out that an inspection of said Sec. 2, discloses that, by its language a tax had already been levied upon gasoline when it was sold and also when it was used within the State, and if the phrase "within this State" be regarded as modifying the words "use or sale" only, the law making body added nothing to the statute. when it fixed a tax upon gasoline "distributed for use or sale within the State." We are then reminded of the principle that a statute will be construed so as to give effect to every word in it. In State ex rel. Murane v. Jack, 52 Wyo. 173, 70 Pac. (2d) 888, the language of the Supreme Judicial Court of Massachusetts, in Opinion of the Justices, 275 Mass. 575, 175 N. E. 644, 646, was quoted to the effect that:

" 'It is a familiar canon of statutory interpretation that every word of a legislative enactment is to be given force and effect so far as reasonably practicable. No part is to be treated as immaterial or superfluous unless no other rational course is open.' To the same effect is Sullivan v. Associated Billposters and Dis-

tributors of the United States and Canada, 6 Fed. (2d), C.C.A. Second Circuit, 1000, 1011, and cases cited."

See also General Ins. Co. of America v. Ham, 49 Wyo. 525, 57 Pac. (2d) 671; Mitchell v. Walters, 55 Wyo. 317, 100 Pac. (2d) 102; Radalj v. Union Savings & Loan Assn., 59 Wyo. 140, 138 Pac. (2d) 984.

If it be argued, say the defendants and appellants, that if the Legislature intended the phrase "within the State" to modify the verbs "sold or distributed" it would have enacted the statute to read "sold or distributed within this State for sale or use"; and that, under such an arrangement of the clause, the phrase "for sale or use" would also modify the verb "sold" as well as the verb "distributed,". thus imposing a tax upon gasoline "sold for sale"—which would be peculiar phraseology to say the least.

It would seem there is much force to these contentions. To them may be added the obvious fact that there cannot be the slightest doubt that so far as "gasoline produced, refined, manufactured, blended, or compounded and *used* within this State" the phrase "within this State" modifies the verb "used." It would appear reasonable that the rest of the clause in question framed as it is like that just quoted, viz, "all gasoline produced, refined, manufactured, blended, or compounded and sold or distributed" the subsequent phrase "within this State" should be regarded as modifying both the verbs "sold or distributed" also; and that the explanation of the position of the words "within this State" is that this was done to avoid repetition of that phrase in a clause reading "sold within this State or distributed within this State for sale or use." Such an interpretation of the statute

leads to the same results so far as the present litigation is concerned as that which will presently be stated.

We are inclined to think that regardless of where the gasoline in question was sold and regardless of Park boundaries, that gasoline was both used in this State and distributed in this State upon the facts presented by the record before us.

In State v. Crane Hook Oil Storage Co., 2 Ter. (Del) 201, 18 A. (2d) 427, it was held that the Delaware statutes taxing gasoline imported into that State for use were intended to impose a tax on the use of such property within the broad primary meaning of the word "use." Concerning this meaning the Court said:

"Lexicographers and courts agree that the word "use" is one of the most comprehensive words in our language. 66 C. J. 65. As a noun, the primary definitions are, inter alia, the application of anything to an end, the act of employing anything, or of applying it to one's service. The exercise of any right of ownership over property is a use of it. Possibly the word may have the meaning of 'consume,' but such is not its usual significance. See In re Moor's Estate, 163 Mich. 363, 128 N. W. 198. As we view the sense of the word in its relation to the language of statutes, we think it was not meant that the incidence of the tax should be restricted to gasoline actually consumed in the operation of motor vehicles on the public highways of the State."

Confirmatory of this language we find that the Wyoming Legislature, in enacting the use tax law of 1937 (Laws of Wyo. 1937, Ch. 118, Sec. 2 (b) has declared that:

" 'Use' means and includes the exercise of any right or power over tangible personal property incident to the ownership of that property, except that it shall not include the sale of that property in the regular course of business."

In Edelman, State Treasurer, et al. v. Boeing Air Transport, Inc., 289 U. S. 249, 53 S. Ct. 591, 77 L. Ed. 1155, the Federal Supreme Court had before it the then gasoline tax law of this State (Sec. 115-1102 W.R.S. 1931) which read:

"A license tax of four cents per gallon is hereby levied on all gasoline used or sold in this State for domestic consumption to be collected as hereinafter set forth."

The Boeing Company imported gasoline from without Wyoming for consumption in the tanks of its airplanes operated in interstate commerce. This motor fuel was stored in tanks owned by the Boeing Company at the Cheyenne Airport. It was withdrawn from these storage tanks, of course, to get it in the tanks of the plane motors. The transportation company claimed this gasoline was untaxable under Wyoming law because the sale of the motor fuel occurred without the State and the fuel itself was actually used and consumed in interstate commerce. Rejecting these contentions the National Supreme Court held that the withdrawal of the gasoline from storage was a taxable use within the Wyoming statute aforesaid. We find in the opinion of Mr. Justice Stone, the following language employed:

"As the statute has been administratively construed and applied, the tax is not levied upon the consumption of gasoline in furnishing motive power for respondent's interstate planes. The tax is applied to the stored gasoline as it is withdrawn from the storage tanks at the airport and placed in the planes. No tax is collected for gasoline consumed in respondent's planes either on coming into the state or on going out. It is at the time of withdrawal alone that 'use' is measured for the purposes of the tax. The stored gasoline is deemed to be 'used' within the state and therefore subject to the tax, when it is withdrawn from the tanks. Compare Nashville, Chattanooga & St. Louis Ry v. Wallace, 288 U. S. 249, 53 S. Ct. 345,

350, 77 L. Ed. 730,. decided February 6, 1933; Gregg Dyeing Co. v. Query, 286 U. S. 472, 52 S. Ct. 631, 76 L. Ed. 1232; Hart Refineries v. Harmon, 278 U. S. 499, 49 S. Ct. 188, 73 L. Ed. 475; Bowman v. Continental Oil Co., 256 U. S. 642, 41 S. Ct. 606, 65 L. Ed. 1139.

"A state may validly tax the 'use' to which gasoline is put in withdrawing it from storage within the state, and placing it in the tanks of the planes, notwithstanding that its ultimate function is to generate motive power for carrying on interstate commerce. Such a tax cannot be distinguished from that considered and upheld in Nashville, Chattanooga & St. Louis Ry. v. Wallace, supra."

The ruling in the Boeing case has, so far as drawn to our attention, never been overthrown. It has been followed by many subsequent decisions of the courts of the nation. We deem it sufficient to mention but one: Pan-American Petroleum Corp. v. State of Alabama ,67 Fed. (2d) 590, (C.C.A. Fifth Circuit). There the law provided that the gasoline tax should be paid "upon the selling, distributing; or withdrawing from storage for any use, gasoline as hereinafter defined, in this State, provided, however, that this excise tax shall not be levied upon the sale of gasoline in interstate commerce." (Gen. Acts of 1927, No. 340, P. 327). The Court held that the withdrawal from storage tanks of gasoline in the State of Alabama, for sale to a post exchange on a United States military reservation within that State, and over which reservation the State had then no jurisdiction to tax, was not exempt from the State excise levy aforesaid. This language appears in the Court's opinion:

"Appellant contends that the tax accrues only upon the use within the state of gasoline. In our opinion it is payable upon the withdrawal of gasoline from storage within the state, because by the very language of the statute the tax imposed applies to dealers, distributors, and storers, the moment they with-

draw it from storage, whether the withdrawal be for sale or other use. It hardly can be assumed in view of this language that the Legislature intended to forego the tax if only the purchaser of gasoline intended to use it in another state, and at the same time insist upon the tax if the purchaser intended to use the gasoline within the state. That a state has the power to levy an excise tax upon the withdrawal of gasoline from storage regardless of the use to which it is put, and even though it be consumed in the generation of motive power for carrying on interstate commerce, is settled by the decision of the Supreme Court in Edelman v. Boeing Air Transport, 289 U. S. 249, 53 S. Ct. 591, 77 L. Ed. 1155."

It is insisted by plaintiff that these cases are not applicable here. It is said that the "Boeing case does not hold that the 'withdrawal' of the gasoline from storage constitutes a taxable 'use' of the gasoline." But we find in Ervin v. State of Alabama, 80 Fed. (2d) 432, the Circuit Court of Appeals for the Fifth Circuit said:

"It has been decided that the tax is a valid excise upon the storage of gasoline measured by the withdrawals. State v. City of Montgomery, 228 Ala. 93, 151 So. 856; Pan American Petroleum Corporation v. State of Alabama (C.C.A.) 67 F. (2d) 590. c/f Foster & Creighton Co. v. Graham, 154 Tenn. 412, 285 S. W. 570, 47 A.L.R. 971; Nashville, C. & St. L. R. Co. v. Wallace, 288, U. S. 249, 53 S. Ct. 345, 77 L. Ed. 730, 87 A.L.R. 1191; Edelman v. Boeing Air Transport, 289 U. S. 249, 53 S. Ct. 591, 77 L. Ed. 1155."

In Coverdale, Sheriff v. Arkansas-Louisiana Pipe Line Co., 303 U. S. 604, 58 S. Ct. 736, 82 L. Ed. 1043, Mr. Justice Reed remarks in the course of his discussion of the case then in hand:

"A narrow distinction in fact exists between the tax held invalid in the Helson Case (Helson v. Kentucky, 279 U. S. 245, 49 S. Ct. 279, 73 L. Ed. 683) and the valid tax considered in Nashville, Chattanooga & St. Louis Ry. Co. v. Wallace, 288 U. S. 249, 53 S.

Ct. 345, 77 L. Ed. 730, 87 A.L.R. 1191, where a tax on gasoline brought into the state, stored and then used to drive engines in interstate transportation, was held valid. *The storage and withdrawal was an intrastate, taxable event.* See, also, Edelman v. Boeing Air Transport, 289 U. S. 249, 252, 53 S. Ct. 591, 592, 77 L. Ed. 1155; Gregg Dyeing Co. v. Query ,286 U. S. 472, 479, 52 S. Ct. 631, 634, 76 L. Ed. 1232, 84 A.L.R. 831." (Italics supplied).

In the later case of Southern Pacific Co. v. Gallagher, 306 U. S. 167, 59 S. Ct. 389, 83 L. Ed. 586, the same jurist writing the opinion for the same court said, referring to the case of Nashville, C. and St. L. Ry. v. Wallace, 288 U. S. 249, 53 S. Ct. 345, 77 L. Ed. 730:

"Particular attention is called by the state to the Wallace Case. There the tax was on 'selling or storing or distributing gasoline.' *It became due on withdrawal from storage.* The tax was held applicable to gasoline, purchased out of the state and stored in the state, when 'all is withdrawn and used * * * as a source of motive power in interstate railway operation' and valid against the objection that 'it is in effect a tax upon the use' in interstate commerce." (Italics supplied.)

It may be properly recalled just here that Mr. Justice Stone said in the Edelman case that the tax involved there "cannot be distinguished from that considered and upheld in" the Wallace case.

It is also said for the plaintiff that the peculiar wording of the Alabama Statute, viz., "withdrawing from storage" distinguishes the Pan-American case from that at bar. But we think, on principle, both the Boeing case and the Pan-American case are applicable to the facts presented here. Both storage in the tanks of the plaintiff's bulk plant at Cody and the withdrawal thereof into the tank trucks of the Consignee in charge of that plant at Cody, for delivery to the con-

tractors in the Park were certainly "the exercise of any right or power over tangible personal property" which is what the word "use" is defined to be as we have seen. The fact that the Alabama law in the Pan-American case directs the incidence of the tax upon "withdrawing from storage" was merely applying the tax to a particular kind of "use" of the motor fuel.

The word "use" being, in its proper definition, broad enough to include such acts as storing and withdrawal from storage, it follows necessarily from the definitions aforesaid and the authorities above reviewed that the gasoline in the case at bar was "used within this State" and so subject to taxation as such. Other reasons might be readily supplied why Sec. 2, Ch. 72, Laws of Wyoming, 1935, imposes a tax upon the gasoline here involved, but sufficient has been said to indicate our view that the tax should be upheld under Wyoming law alone.

The case of Union Oil Co. of California v. State of Washington, 2 Wash. (2d) 436, 98 Pac. (2d) 660, is cited as persuasive authority contrary to the Edelman and Pan-American cases, supra. But the following quotation from the opinion of the majority of the court discloses that a question was for decision quite different from those which we regard as of controlling force here. The Court said:

"Counsel for the state concede that the tax is not exacted for the sale or use of the gasoline, but contend that it is an excise tax upon the distributor for the privilege of engaging in such business, measured by the number of gallons *distributed* by such distributor.

"It is clear that the gasoline was not sold or used by appellant therefore, unless the gasoline was distributed by appellant within this state, the tax claimed may not be exacted.

"When appellant transferred the gasoline from its bulk storage tanks into the tanks of its own service stations, it did not distribute that gasoline to itself. Surely, it is not necessary to recite sustaining authority for the statement that one can not distribute to himself."

In the case at bar counsel for the State contrariwise contend that the gasoline tax falls upon the "use" within the State through withdrawal of the fluid for sale to the contractors in the Park. It is to be observed that the Court also says that in transferring the gasoline from its own bulk storage tanks to its own service stations it was not distributing the motor fuel, and that, unless it was held that such an act constituted a distribution, there could be no tax imposed. The authority of the case would seem to be much weakened because of the decision being rendered by a seriously divided court. In the minority opinion we find the following significant statement relative to the position taken by the appellant, the Union Oil Company:

"The appellant concedes in its brief that, in making deliveries to independently owned stations, the tax is payable when the gasoline is withdrawn from bulk storage for delivery, because there is then a sale and delivery in the sense of giving possession to the retailer."

Before leaving this phase of the case at bar it may not be amiss to point out that one of the primary meanings ascribed to the verb "distribute" is to "allot." Webster's New International Dictionary, 2nd Ed.; 18 C. J. 1290. When the gasoline in question here was drawn off from plaintiff's bulk plant tanks at Cody into Consignee's tank trucks for haulage to the Park, pursuant to a request by a contractor that motor fuel was needed by him or it in connection with the highway work, it would appear to have been "allotted" in this State to such contractor. In other words, the

gasoline was "distributed" to the contractor in this State and for sale to him and as a consequence it was taxable.

It is contended by the defendants, also, that the gasoline in question is likewise taxable under a proper interpretation of the Hayden-Cartwright Act (June 16, 1936, Title 4 U.S.C.A. § 12) which before its amendment, and as applicable to the facts of this case read:

"(a) All taxes levied by any State, Teritory or the District of Columbia upon sales of gasoline and other motor vehicle fuels may be levied, in the same manner and to the same extent, upon such fuels when sold by or through post exchanges, ship stores, ship service stores, commissaries, filling stations, licensed traders, and other similar agencies, located on United States military or other reservations, when such fuels are not for the exclusive use of the United States. Such taxes so levied, shall be paid to the proper taxing authorities of the State, Territory or the District of Columbia, within whose borders the reservation affected may be located.

"(b) The officer in charge of such reservation shall, on or before the fifteenth day of each month, submit a written statement to the proper taxing authorities of the State Territory or District of Columbia within whose borders the reservation is located, showing the amount of such motor fuel not sold for the exclusive use of the United States during the preceding month." Subsequent amendment has so clarified the law that, as we understand the matter, under facts such as recited above sales of gasoline are now regarded by the vendors and state authorities alike as taxable.

This Court, in the case of State v. Yellowstone Park Company, 57 Wyo. 502, 121 Pac. (2d) 170, had occasion to consider the effect of the Act as it is set forth above. There we were asked to decide whether gasoline sold in Montana and consumed by the com-

pany's motor vehicles, in that portion of the Park within the exterior boundaries of the State of Wyoming, was taxable under the federal law just quoted. We there held that such consumption of the gasoline in the Park was not taxable and declined to hold that the term "sale" as employed in the Hayden-Cartwright Act would include the term "use." In the case at bar the plaintiff claims that the sales in question all took place in the Park and it is conceded that the transactions, so far as the Park is concerned, were within the exterior boundaries of the State of Wyoming. If that be so then that fact differentiates the Yellowstone case from the litigation we are now considering. For present purposes we shall assume that plaintiff's contention in this respect is correct.

The plaintiff asserts that the transactions here involved are not taxable under the Hayden-Cartwright Act, because the sales of gasoline were not made by or through an agency of the kind designated in the Act and also that the agency making the sales was not located in the Park.

With reference to the first contention of plaintiff set forth above we are obliged to conclude that it is not well founded.

Under date of September 22, 1936, the Attorney General of the United States responded to an inquiry from the Secretary of the Interior, whether Sec. 10, of the Hayden-Cartwright Act, approved June 16, 1936, authorized the collection of state taxes on sales of gasoline and other motor vehicle fuels by concessioners operating within the limits of the National Parks. Concluding that such taxes were proper on sales of this character made by such concessioners, the Attorney General said (Vol. 38 Ops. Attorneys General, 522, 524, 525) :

"The fact that the Congress has not used the word 'concessioners' in enumerating the agencies through which motor vehicle fuels are sold on Government reservations is not controlling. It is to be observed that 'filling stations,' which obviously are capable of supplying a type of service that may be maintained either in connection with, or separate from, any of the other agencies mentioned, are enumerated coordinately with them; and that the words 'and other similar agencies' relate as well to 'filling stations' as to the other agencies which, like them, are particularized. I know of no reason why filling stations may not function in the national parks—indeed, I note that the form used by the Department of the Interior in contracting with concessioners in the national parks authorizes them to install and maintain 'gasoline filling stations.' Concessioners maintaining gasoline filling stations in the national parks would seem to fall precisely within the category of operators of 'filling stations' or, at least, of 'other similar agencies.'

"For these reasons, and having in mind the purposes of the Act as a whole, I conclude that concessioners located in the national parks, selling motor vehicle fuels, are located on United States reservations within the contemplation of Section 10 of the Hayden-Cartwright Act, and that by virtue of that section the States may levy taxes on sales of gasoline and other motor vehicle fuels by or through such concessioners when such fuels are not for the exclusive use of the United States."

We are not inclined to think that the Attorney General would have arrived at a different result if it had appeared that a concessioner had owned large gasoline tanks without the Park limits and had employed his own trucks or the trucks of others to bring this gasoline into the Park and sold it there to customers directly from the tank trucks instead of depositing it in an underground tank from which it was pumped by hand or by motor into the usual filling station container and run from thence into the tanks or barrels of customers. Under such circumstances

we believe the concessioner should be very properly included within the meaning of the words of the Act —"other similar agencies."

In McLaughlin, Tax Commissioner v. Poucher et al. 127 Conn. 441, 17 A. (2d) 767, it is said:

"While the word 'similar' has at times been construed as synonymous with 'same' or 'identical,' its usual significance is that contained in the definition in Webster's International Dictionary, 'nearly corresponding; resembling in many respects; somewhat alike; having a general likeness.' Fidelity & Deposit Co. v. Brown, 92 Vt. 390, 394, 104 A. 234; Fletcher v. Interstate Chemical Co., 94 N. J. L. 332, 110 A. 709; In re Bonsall's Estate, 288 Pa. 39, 41, 135 A. 724. The word as ordinarily used implies an allowance for some degree of difference."

The case of In re Bonsall's Estate, 288 Pa. 39, 135 A. 724, referred to in the foregoing excerpt points out that:

"Judicially, 'similar' has been defined as 'nearly corresponding, resembling in many respects; somewhat alike; having a general likeness' (Frankel v. German, etc., Co., 121 Mo. App. 51, 97 S. W. 961); not 'precisely alike' but 'with more or less resemblance' (State ex. rel. Sigsbee v. Birmingham, 160 Ala. 196, 48 So. 843; Greenleaf v. Goodrich, 101 U. S. 278, 25 L. Ed. 845). In Rhode Island State Hospital Trust Co. v. Olney, 16 R. I. 184, 13 A. 118, the court said that 'similarity is not identity, but resemblance between different things'."

The resemblance between the different agencies mentioned in the statutes, having regard to the purpose and history of the Hayden-Cartwright Act, is that they make sales of gasoline on government reservations and we deem that factor is the important thing to be kept in mind in construing the words "other similar agencies." If an agency sells gasoline or motor fuels in the Park we are inclined to think that it was

the intent of the Act to make such sales subject to the Wyoming gasoline tax law. The resemblance intended by the framers of the statute in employing the words "other similar agencies" was in the matter of sales of motor fuel.

If this construction is not given to the law the consequence would apparently be that when sales of gasoline were made through post exchanges on military reservations, for example, post exchanges being agencies of the government, (Standard Oil Co. of California v. Johnson, Treasurer, 316 U. S. 481, 62 S. Ct. 1168, 86 L. Ed. 1611) such sales would be taxable, but when a person or corporation merely drove a truck tank into the reservation and sold gasoline to customers there, such motor fuel would be exempt from state taxation. The practical result of this would be to prevent a post exchange from selling gasoline at all, for the sales from the truck could be made at a lower rate per gallon—lower to the extent of the state tax,—in Wyoming the sum of four cents. We do not believe Congress intended any such unjust or absurd result to ensue from the adoption of the statute in question, especially when its legislative history is recalled. See State of Minnesota v. Keeley et al., 126 Fed. (2d) 863.

In Houghton Bros. v. Yocum et al, 40 Wyo. 57, 274 Pac. 10, a well known rule of statutory construction was invoked in this language:

"And a construction producing unjust or absurd results will not be adopted unless the terms of the statute preclude any other construction. Landers v. Smith, 78 Me. 212, 3 Atl. 463; Harrison v. Harman, 76 W. Va. 418, 85 S. E. 646."

Indeed, the only exception that Congress inserted in the Act was the provision relative to sales of gasoline or other motor fuels "for the exclusive use of the

United States." Speaking of exceptions in statutes, in Rural Electric Company v. State Board of Equalization, 57 Wyo. 451, 120 Pac. (2d) 741, it was said:

"In view of these specific exceptions we are at once confronted with the fact that 'we cannot overlook the well-settled principles that when the legislature has made exceptions to a general rule, it must be deemed to have included in its exceptions all that it intended to except.' Rothschild v. Superior Court, 109 Cal. App. 345, 293 Pac. 106, 108. Many cases in support of this rule are cited in 59 C. J. 1092, including in Re Caldwell's Estate, 26 Wyo. 412, 186 Pac. 499."

So in Town of Purvis v. Lamar County, 161 Miss. 454, 137 So. 323, the Court remarked that:

"When a statute contains exceptions in express language, there is an admonition to the courts that the exceptions thus expressed are the only ones contemplated, and that further exceptions should not be ingrafted by construction unless the necessity therefor be inescapable or the propriety thereof be substantially incontrovertible."

We are unable, either, to perceive that the contention of plaintiff that the agency making the sale was not located in the Park, is well founded if plaintiff's claim that the sale was made in the Park is correct. We have seen that the gasoline in question was transported into the Park in the truck tanks of plaintiff's Consignee; that the latter's employees who drove these vehicles wrote out the sales invoices in the Park, upon delivery of the gasoline, into the contractors' tanks; that these invoices were signed by the contractors' representatives and that payment was made to plaintiff, either directly by check payable to it, or by check payable to plaintiff, and handed to said employees for transmission to plaintiff. Certainly the employees making the sales and the trucks transporting the motor fuel were located in the Park when these sales were made. They were assuredly not outside the Park.

174

That they were not permanently located in the Park would seem to be of no significance. The statute makes no such requirement and the word "located" has of itself "no reference to time. It has reference entirely to place." Fairbanks v. United States, 223 U. S. 215, 32 S. Ct. 292, 56 L. Ed. 409.

Finally recurring to the opinion of the Attorney General mentioned and quoted from above, it is to be observed that it is stated therein that "The section of the Act under consideration effects a partial waiver of the exclusive jurisdiction of the United States under its land laws." If this be so, and we are inclined to agree that it is the proper view of the statute, the Park boundaries were obliterated by the Hayden-Cartwright Act so far as sales of motor fuels were concerned when such sales were not made "for the exclusive use of the United States." It follows necessarily that the sales in question were, so far as taxability is concerned, properly regarded as had within the State of Wyoming.

Entertaining the view that, both under the gasoline tax law of the State of Wyoming and under the Hayden-Cartwright Act, before its amendment and as quoted above, the sales of motor fuel, under the circumstances involved in this litigation were taxable, we are constrained to reverse the judgment of the District Court of Laramie County with instructions to dismiss plaintiff's action.

KIMBALL, C. J., and BLUME, J., concur.

*Reversed.*

ON PETITION FOR REHEARING
Rehearing Denied, July 11, 1944
(150 P. 2d 99)

## OPINION

RINER, JUSTICE.

A petition for rehearing has been filed in this cause on behalf of the plaintiff below supported by an extended brief. It is asserted therein that the Court "erred in dismissing the action as to the defendants other than appellants." The original opinion disposing of the case concluded with a direction for the reversal of the judgment rendered in the District Court and "with instructions to dismiss plaintiff's action." An examination of both the record and opinion thereon discloses that the only "action" presented to us for review and considered by the Court was that against the two state officials, C. F. Siefried, as State Highway Superintendent, and Louis J. O'Marr, as State Attorney General. The dismissal ordered, as would have been made perfectly clear when the mandate herein issued, intended to and could deal only with plaintiff's action against the state officials aforesaid. Not one word of the opinion is concerned with legal controversies if any there were existing between plaintiff and the other defendants in the case below. There were no arguments either in the briefs of the parties or pre-

sented on the oral hearing of the cause which required a consideration of any such controversies. In order, however, that there may not be the least misunderstanding as to what was intended by the direction referred to above in the original opinion, the mandate when issued will, so far as this matter is concerned simply direct the dismissal by the District Court of Laramie County, of the plaintiff's action against the above mentioned officials of the State of Wyoming.

Relative to the other points raised by the petition for a rehearing they appear to be devoted to a re-examination of the questions and matters heretofore presented to this Court by briefs and argument on behalf of the plaintiff, given mature consideration on our part, and disposed of as we deemed the law to be. Rarely, indeed, are opinions rendered in connection with applications for a rehearing and involving a denial thereof which convince counsel they should have lost in the litigation determined thereby. No useful purpose would be accomplished by again traversing the ground covered by the original opinion herein.

Plaintiff insists that our interpretation of the several statutes involved is a quite mistaken one. After studying plaintiff's re-argument with care we are unable to see that this is so. Being of that opinion we must decline to grant a rehearing, and the petition requesting it will accordingly be denied. See Watts v. Lawrence, 26 Wyo. 378, 188 Pac. 34, where the rule governing rehearings here is set forth and which was reiterated and followed in Bankers Life Co., v. Nelson, 56 Wyo. 513, 111 Pac. 2d 136.

*Rehearing Denied.*

KIMBALL, C. J., AND BLUME, J., *concur.*